[Crim. No. 6237.   Second Dist., Div. One.   Dec. 1, 1958.]

THE PEOPLE, Respondent, v. HENRY G. ANDREWS et al., Defendants; LOUIS APODACA et al., Appellants.

Max Solomon and John J. Bradley for Appellants.

Edmund G. Brown, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Respondent.

LILLIE, J.—Appellants and others were charged in Count I of an indictment with conspiracy to cheat and defraud in

violation of section 182, Penal Code, to commit theft in violation of section 484, and with intent to defraud, to falsify and cause to be falsified, the books and records of Peterson Manufacturing Company, in violation of section 3020, subdivision (b), Corporations Code; and in Count II with grand theft of money from the Peterson Manufacturing Company and other named corporations in violation of section 487, Penal Code. All appellants pleaded not guilty and unsuccessfully sought separate trials; thereupon trial by jury was waived and appellants stipulated to the submission of the cause on the grand jury transcript reserving the right to produce additional testimony. At the trial no additional evidence was offered by appellants. After denying their motion to dismiss, the court acquitted them on the conspiracy count and adjudged each guilty of grand theft as alleged in Count II. Motions for new trial having been denied, the judgment of conviction of grand theft was vacated and the lower court found appellants guilty of petty theft, a lesser but necessarily included offense. They have appealed from the judgment of conviction and order denying motion for a new trial.

Viewed in the light most favorable to respondent, it appears from the evidence that during 1957 all of the appellants were employed as truck drivers by Peterson Manufacturing Company, which operated a rendering plant in the city of Los Angeles. Butcher scraps, such as suet, grease and bones, were collected from various markets and chain stores, brought into the Peterson plant, and rendered down into tallow for soap makers, the meat and bone residue being converted to poultry feed. Thirty-three routes, each handled by a driver and helper, or swamper, served the metropolitan area, the number of stores on each route varying from 20 to 40. At each market or store the material was weighed by the driver who noted the correct amount of collected suet or bone on both his route book and on a blue card that hung in the store. The butcher scraps were then taken to the truck, suet being placed in a suet bin and bone in the bin provided therefor. Peterson Manufacturing Company provided its drivers with two route books in which daily entries were made of the poundage collected at the various stores—on Mondays, Wednesdays and Fridays the "A" book was used, and on Tuesdays and Thursdays the "B" book. At the end of each month the entries in both books were totaled by the Peterson accounting department, a bonus being added when the tonnage so warranted. Peterson then issued its checks payable to the stores for the

total amount collected at the rate of three and three-quarter cents per pound for suet and one cent per pound for bone. These checks were taken by the drivers and personally delivered to the markets on their routes.

The prosecution charged that some drivers, including these 14 appellants, would credit certain markets with more material than collected, whereas other stores (usually chain operations) were credited with less than actually picked up; that the stores receiving these fictitious credits, and which were known in the trade as "drops," would then split the proceeds of the Peterson check with appellants. Becoming suspicious of their drivers' operations, Peterson employed undercover operatives in the role of helpers; they were assigned to appellants' routes and obtained the information which precipitated the indictment which followed.

We summarize the testimony before the grand jury as it applied to each appellant. The transactions at each market, all occurring in 1957, were observed and testified to by the undercover helper on the particular route.

Louis Apodaca was assigned to route 22 in the El Monte and Covina areas. On July 25, he picked up 135 pounds of suet at one market and recorded 450 pounds. On July 5, he picked up 100 pounds of bone and recorded 200 pounds. On July 8, appellant collected 240 pounds and the store in question was credited with 850 pounds. On numerous other occasions that same month he credited various stores with substantially more poundage than collected, and in some instances stores were credited with material when none in fact was taken therefrom. On September 14, appellant admitted his irregularities to an investigator from the district attorney's office.

Cecil Diaz, Sr., was assigned to route 6 in the Pasadena area. On September 6, he picked up 30 pounds of material at one market and credited the store with 115 pounds. Earlier, on September 4 he collected approximately 110 pounds at three markets and gave them a total credit of approximately 560 pounds. On another occasion, appellant took a credit of 170 pounds but collected only 70. Questioned by an investigator, appellant made incriminating admissions and told of sums received from certain markets where overweights had been recorded.

Ward Eytcheson had route 30 in the San Fernando area.

On July 30, he made a pickup at one market of 521 pounds but gave credit for 821; the following day 350 pounds were collected and 650 pounds credited in appellant's book. Similar irregularities were observed on August 1, 2, 5, 7, 8 and 9. No admissions of guilt were made by appellant when questioned by an investigator.

Harold Ford was assigned to route 25 which covered the Westwood area. On July 8, he picked up 485 pounds of suet and credited the market with 670. Similar irregularities were witnessed on July 6, 9, 11, 15 and 16. Appellant admitted to an investigator that he had a working arrangement with the operators of certain markets for a percentage of the monthly check he delivered to them.

Philippe J. Giraud was the driver on route 14 in the Hollywood district. On June 19, 20, 24, 25, 27 and 28, he credited one market with more suet than he collected. Similar irregularities were observed at other markets on other occasions during June, appellant admitting "shorting" some markets and crediting certain "drops" for which he received "a few bucks" from one market and "tips" from others in the form of a turkey or a ham.

John L. Hill's route, number 16, was located in the southern part of Los Angeles. On several occasions during July he picked up less material than recorded. He admitted receiving $35 to $50 monthly from the operator of one market and $55 monthly from another.

Florian R. Lubanski credited two separate markets in the Lynwood-Southgate area with more material than collected. On July 29, 30 and 31, and August 2 and 5, he admitted to an arrangement with one market. Thus, in June, he received from it approximately $90; in July approximately $95 and in August approximately $115.

Jerry Peterson had route number 11. The stores in this route were in the Sherman Oaks area and included a number of chain operations at one of which, on August 21, he picked up 459 pounds and gave credit for only 295 pounds. On August 23, he collected 294 pounds of suet and gave credit for only 200 pounds. At other markets during July and August, credit was given for more than collected by him.

Robert Scarborough's route was in the South Bay area of Los Angeles County. On August 23, he collected 780 pounds of suet at a chain store and gave them no credit at all. On August 19, he shorted another chain store by 35 pounds.

During other occasions that same month he credited markets with more than collected. Appellant admitted to an investigator that he received "kickbacks" from certain markets and had obtained $2,500 in that manner over a one-year period.

Thomas H. Zinnen, Jr., was the driver on route 26, situated in the Pasadena area. On July 23, 24, 25 and 26, he credited one market with more suet than collected. On July 25, he picked up nothing at this same store but credited the account with 317 pounds of suet and 291 pounds of bone. Other irregularities were witnessed at other stores on July 2 and July 5.

Eldon P. Sharp's route was in the Glendale district. On August 21, he collected 280 pounds of suet at a chain store and gave them credit for only 100 pounds. Other markets, however, were credited with more material than collected on several occasions that same month. Incriminating admissions were made by appellant when interrogated by an investigator, among them the acceptance of gifts from certain store owners on the route.

Jack Ulmer, on several occasions in July and August, credited certain markets with more than collected. He admitted there were "drops" on his route and that the split with one "drop" was 60-40 (60 to him) and with others two-third to him and one-third to the "drop."

Dumont S. Meier had numerous "drops" on his route located in the Westchester area. At one such market the helper saw appellant paid off in cash.

Delancy L. Shedd was the driver on route 12. The helper assigned to this route testified that one Mazotti was the driver for the first week and a half, and for the second week and a half Shedd was the driver. There was testimony from the helper of false weights during one of these 10-day periods but the witness did not indicate which driver was then on duty. The attorney general does not urge an affirmance as to this appellant.

On appeal it is contended that (1) each appellant was deprived of his right to a separate trial by jury because of the erroneous allegation of a general conspiracy in Count I which allowed all the appellants to be charged in Count II with theft in a single count; and (2) the corpus delicti of grand theft was not established.

As to their first ground for reversal, appellants argue that

no evidence of a general conspiracy was presented to the grand jury. They assert that there were 33 routes maintained by Peterson, encompassing a huge area of Los Angeles County, and that no evidence was produced that a driver of one route, in the San Fernando area for example, had an agreement with drivers on routes located many miles distant, or that he even had any knowledge of what such other drivers were doing.

■ A conspiracy may be established by circumstantial evidence. ■ It is "not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citation), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy." (*People* v. *Steccone*, 36 Cal.2d 234, 238 [223 P.2d 17].) ■ Furthermore, "(f)rom the very nature of the stealth generally involved in the crime of conspiracy, it is not necessary to prove that the parties came together and reached a formal agreement." (*People* v. *Massey*, 151 Cal. App.2d 623, 652 [312 P.2d 365].) ■ Although it is true that mere association is not sufficient to prove a criminal conspiracy and there must be evidence of some participation or interest in the commission of the crime (*Dong Haw* v. *Superior Court*, 81 Cal.App.2d 153, 158 [183 P.2d 724]), "(t)he conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." (*People* v. *Massey*, 151 Cal.App.2d 623, 652 [312 P.2d 365].) ■ Also, "(t)he crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same unlawful result." (*Anderson* v. *Superior Court*, 78 Cal.App.2d 22, 24 [177 P.2d 315].) ■ In the case at bar it appears from the record that all the appellants were employed by the *same* company to perform the *same* duties, followed the *same* pattern or technique and usually received substantially the *same* "kickback" percentage from the markets. Additionally, the *same* practice continued over a relatively long period of time, during which helpers were urged to join the operation. This close similarity of procedures justified the grand jury's conclusion that there were reasonable grounds to believe that a conspiracy existed. ■ Since the law does not require direct proof of an actual understanding between coconspirators as the basis for an indictment (*Bompensiero* v. *Superior Court*,

44 Cal.2d 178, 184 [281 P.2d 250]), we find no merit in appellants' contentions.

Further, in connection with their claim that each was denied the right to a separate trial by jury, appellants contend that section 954, Penal Code, does "not eliminate the fundamental right of the accused to a separate trial." At the outset, it should be noted that defendants personally waived their right to a jury trial. Under the provisions of section 954, a single accusation may charge two or more different offenses connected together in their commission, or different statements of the same offenses, or two or more different offenses of the same class of crimes or offenses under separate counts. ▇ In the case of *In re Pearson*, 30 Cal.2d 871 [186 P.2d 401], the court held that different offenses may be joined even though not related to the same transaction if there is a common element of substantial importance in their commission. Appellants do not deny that the crimes here involved possess such a common element, but argue that the provisions of section 954 apply only to different offenses by the same person and not, as here, to separate offenses by separate persons against different victims and at different times. They rely heavily upon certain declarations in *People v. Davis*, 42 Cal.App.2d 70, 74-75 [108 P.2d 85]. ▇ However, in *People v. Duane*, 21 Cal.2d 71, 76 [130 P.2d 123], the Supreme Court pointed out, the Davis case being distinguished, that trial with a codefendant charged with a separate offense "distinct and unconnected" may be prejudicial only if the evidence of the commission of separate offenses is dependent upon "an entirely different state of facts." That is not the situation with the appellants in the instant case. In the Duane case, *supra*, 76-77, the court also notes that consolidations of indictments alleging different dates and victims has been approved in this state. ▇ Further authority adverse to appellants' position is found in *People v. Burton*, 91 Cal.App.2d 695, 714 [205 P.2d 1065], and cases there cited, all of which declare that two or more persons jointly charged must be tried jointly, unless the court orders separate trials. (Pen. Code, § 1098.) Although the instant record, as corrected subsequent to oral argument, discloses that motions for severance were made, they were unsupported by any affirmative showing, and standing alone do not entitle appellants to any particular consideration on appeal. ▇ Appellants emphasize in their brief the injustice done appellant

Shedd, as to whose guilt the evidence was unconvincing, but any abuse of discretion in the denial of a severance must be determined upon the basis of the showing when the motion was made and not what ultimately transpired. (*People* v. *Santo,* 43 Cal.2d 319, 332 [273 P.2d 249]; *People* v. *Terrell,* 138 Cal.App.2d 35, 55 [291 P.2d 155].) ▉ At this point, the following from *People* v. *Isby,* 30 Cal.2d 879, 897 [186 P.2d 405], is well applicable: ''There is likewise no merit to defendants' position that the court erred in refusing to grant their respective motions for a separate trial. The code section bearing upon this subject provides that when two or more defendants are jointly charged with a public offense, whether felony or misdemeanor, 'they must be tried jointly, unless the court order separate trials.' (Pen. Code, § 1098.) And it has been held repeatedly that a defendant so charged is not entitled as a matter of right to a separate trial (*People* v. *Rocco,* 209 Cal. 68, 73 [285 P. 704]; *People* v. *Eudy,* 12 Cal.2d 41, 45 [82 P.2d 359]), but that the question of severance is one that must be left necessarily to the determination of the trial court in the exercise of its sound discretion. (*People* v. *Bringhurst,* 192 Cal. 748, 753 [221 P. 897]; *People* v. *Goold,* 215 Cal. 763, 766 [12 P.2d 958]; *People* v. *Tinnin,* 136 Cal. App. 301, 317 [28 P.2d 951]; *People* v. *King,* 30 Cal.App.2d 185, 206 [85 P.2d 928].) ▉ It is not an abuse of discretion to refuse to grant a demand for separate trials because damaging testimony, admissible against one defendant and not against the other, may be received in the case, but it is then incumbent upon the court to limit such evidence in its application to the defendant to whom it is referable. (*People* v. *Erno, supra,* 195 Cal. 272, 277 [232 P. 710]; *People* v. *Perry,* 195 Cal. 623, 633 [234 P. 890]; *People* v. *Booth,* 72 Cal. App. 160, 165 [236 P. 987].)'' We find no abuse of the trial court's discretion in the record before us.

▉ Although respondent has correctly asserted that any deficiencies in the indictment were waived by failure to demur (*People* v. *Brac,* 73 Cal.App.2d 629, 635 [167 P.2d 535]) appellants state that they do not complain of improper joinder or of any uncertainty in the pleading; the basis of their complaint, they say, is that all the appellants were prejudiced by their erroneous inclusion in the same indictment, the first count of which improperly charged a general conspiracy among 72 persons and the second count charging the same 72 persons with grand theft—as a result, they conclude,

"each was forced to suffer a 'mass trial' which is not sanctioned by any law in this state." ▮ We have heretofore concluded that there was sufficient evidence to support the charge of conspiracy in the indictment, and the mere subsequent finding of innocence with respect thereto does not, as appellants assert, completely invalidate that count. Contrary to appellants' suggestion that the acquittal of conspiracy brings the case within the case of *Greenberg* v. *Superior Court*, 19 Cal.2d 319 [121 P.2d 713], we find that decision simply holds that an indictment is void and confers no jurisdiction upon the trial court "if it is unsupported by any evidence before the grand jury." (P. 322.)

Respecting appellants' contention that the second count erroneously charged 72 persons with grand theft and subjected appellants to a mass trial, we must take the law as we find it. ▮ Sections 954 and 1098, Penal Code, are controlling and place no limit on the number of counts or the number of defendants in an indictment. The court, in *People* v. *Oster*, 121 Cal.App.2d 750, 753 [264 P.2d 85], stated if a person has committed one hundred felonies, all may be charged in one pleading if each is declared in a separate count. In *People* v. *Jordan*, 24 Cal.App.2d 39 [74 P.2d 519], 17 defendants were charged in one indictment containing 15 counts; counts one and two accused all defendants of the separate crimes of conspiracy therein stated; counts three to fourteen charged only two defendants with the substantive offenses connected with the conspiracy, and count fifteen accused two defendants with another substantive offense. We conclude appellants' contentions are without merit. We point out again that no evidence was presented by appellants to controvert the prosecution's claims, nor did they see fit to cross-examine any of the witnesses who testified before the grand jury. Under the circumstances, appellants are hardly invulnerable to the respondent's charge that they remained silent at the trial, gambling on a favorable judgment, and then when the judgment was adverse, proceeded to raise objections for the first time on appeal. This, together with the convincing evidence of appellants' guilt (save and except for appellant Shedd) further persuades us that there has been here no miscarriage of justice.

Appellants' second point on appeal concerns the alleged failure of the prosecution to establish the corpus delicti of grand theft in connection with Count II. It is urged that

while Count II alleged the unlawful taking of personal property in excess of $200 from Peterson Manufacturing Company, and other named corporations, representing markets doing business with Peterson, the only company representative appearing before the grand jury was an officer of Peterson, and he in fact testified that his company got value received for every dollar paid for the rendering material. Therefore, appellants claim it was not established that the property of any victim was taken against its will. They cite the case of *People* v. *Harvey*, 25 Cal.App.2d 368, 371 [77 P.2d 487], to the effect that the corpus delicti of grand theft consists of (1) a person from whom the property may be taken, (2) an intent to take such property against the will of the owner, and (3) an act performed tending to accomplish the foregoing.

The crime of grand theft may sound in false pretenses (*People* v. *Jones*, 36 Cal.2d 373, 376 [224 P.2d 353]). "A defendant may be convicted of grand theft upon proof of acts establishing embezzlement, larceny, or obtaining money by false pretenses." (*People* v. *Frazier*, 88 Cal.App.2d 99, 102 [198 P.2d 325].) Larceny amounting to grand theft can be committed by trick and device and usually results when the victim of a fraud intends not to pass complete title to his property, but that it shall be applied to a special purpose while the recipient intends to appropriate it to his own use. It is on a parallel with false pretenses. (*People* v. *McCabe*, 60 Cal.App.2d 492, 496 [141 P.2d 54].) The crime of grand theft "sounding in false pretenses" (*People* v. *Jones, supra*, 377) is said to consist of the following considerations: (1) whether there were representations of past events or existing facts as distinguished from a mere expression of opinion or promise of future action, though a promise, if unconditional and made without present intention of performance, will constitute actionable fraud; (2) whether the representations were made with intent to defraud the owner of his property; and (3) whether the owner was actually defrauded in that he parted with his property—both possession and title—in reliance upon the false representations (*People* v. *Jones, supra*, 377). Applying this test to the instant case, each of these elements is present. First, appellants made representations of existing facts which were false, in that they misrepresented to Peterson the actual weights collected from the markets, to which, in turn, Peterson paid money for the fictitious amounts of material collected, it being immaterial that the money was not appropriated exclusively by appel-

lants. (*People* v. *Gatlin*, 75 Cal.App.2d 288, 291 [170 P.2d 1013].) Second, these misrepresentations manifestly supported an inference of intent to defraud, a factual question to be determined by the trier of the fact from all the circumstances of the case (*People* v. *Post*, 76 Cal.App.2d 511, 514 [173 P.2d 48]). The third consideration mentioned in *People* v. *Jones, supra,* is also present because a person is defrauded of his property when he is induced to part therewith by false pretenses and the crime is complete when, by means of such false pretenses, the fraud thereby intended is consummated by obtaining possession of the property sought. (*People* v. *Bryant*, 119 Cal. 595, 597 [51 P. 960].) ▮ As further stated in *People* v. *Bryant, supra,* 597: "It is not necessary to show that the property has been absolutely lost to him (the victim) in order to sustain the charge." ▮ As additionally observed in *People* v. *Talbott*, 65 Cal.App.2d 654, 659 [151 P.2d 317]: "The victim is merely a witness whose ultimate financial gain or loss, in the circumstances, is immaterial. Financial loss is not a necessary element of the crime." Wholly apart, therefore, from the fact that the markets "shorted" might have severed business relations with Peterson, as well as other consequences of a detrimental nature, any claim that the corpus delicti of the crime was not here established is without merit.

It is also contended by appellants Eytcheson, Peterson, Sharp and Zinnen that no admissions or confessions appear in the record and that therefore the evidence was insufficient to sustain their convictions. Their argument is apparently based on section 1110, Penal Code, which provides that a defendant cannot be convicted unless the fact of false pretenses not in writing is proved by the testimony of two witnesses, or that of one witness, and corroborating circumstances. ▮ Here, the evidence would have also sustained a conviction on the theory of obtaining money by a trick and device (*People* v. *Ashley*, 42 Cal.2d 246, 258 [267 P.2d 271]), and corroboration under section 1110 is not necessary (*People* v. *Bartges*, 126 Cal.App.2d 763, 771 [273 P.2d 49]). ▮ Even on the theory of false pretenses, it is only the pretense which must be corroborated (*People* v. *Ashley, supra,* 259), and this may be accomplished by the testimony of two witnesses or one witness and corroborating circumstances. ▮ In the case at bar the helper or "swamper" testified to the irregularities committed by the four appellants at the various markets, and the Peterson representative verified the falsifications of the

appellants' books, which circumstances materially induced the company to part with more money than it was required to. Furthermore, corroborative evidence need only tend to connect the defendants with the offenses charged, and it established that "the circumstances connected with the transaction, the entire conduct of the defendant . . . are proper matters for the consideration of the jury, and may be looked to to furnish the corroborative evidence contemplated by the law." (*People* v. *Frankfort*, 114 Cal.App.2d 680, 701 [251 P.2d 401].)

With respect to appellant Shedd, the attorney general does not urge an affirmance for the reason, and we agree, that the inculpatory evidence is confusing and therefore lacking in sufficient substantiality to support his conviction.

For the reasons heretofore stated, except as to appellant Shedd, the judgment and order appealed from are, and the same is each, affirmed; as to appellant Shedd, the judgment and order are reversed.

White, P. J., and Fourt, J., concurred.