[Crim. No. 7338. Second Dist., Div. Three. July 21, 1961.

THE PEOPLE, Respondent, v. ROY MAGGART, Appellant.

Kenny, Morris & Ibanez and Robert W. Kenny for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Vincent W. Thorpe, Deputy Attorneys General, for Respondent.

FORD, J.—In a nonjury trial, the appellant was found to be guilty of grand theft (Pen. Code, § 487, subd. 1) as charged in an indictment. He was sentenced to the state prison for the term prescribed by law. His appeal is from the judgment[1] and from the order denying his motion for a new trial.

Each of the three counts of the indictment contained an allegation that the appellant took money belonging to Frank A. Pachmayr. In the first count, $750.50 was alleged to have been taken on or about July 15, 1957; in the second count, $10,250 on or about July 16, 1957; and in the last count, $46,000 on or about July 24, 1957. The principal contention of the appellant is that the evidence was insufficient to support the conviction with respect to any of the counts. Consequently, a summary of the pertinent evidence will be stated.

The transactions between the appellant and Mr. Pachmayr related to the purchase by the latter of land scrip.[2] The prosecution conceded that the scrip was worth what it cost Mr. Pachmayr.

Edward Mayhew testified that in July 1957, he was acting as a senior clerk at the Los Angeles main office of the Bank

---

[1]The determination that the appellant was guilty was made on March 11, 1960. Judgment was pronounced on June 14, 1960. The notice of appeal states in part that the defendant ''appeals from the judgment of conviction rendered against him on March 11, 1960.'' But ''a notice of appeal will be liberally construed to permit a hearing on the merits and avoid a dismissal because of some technical defect or irregularity.'' (*People* v. *Robinson,* 43 Cal.2d 143, at p. 145 [271 P.2d 872].) It is obvious that the appellant intended to appeal from the judgment; the mistake in the date will be disregarded. (*Cf. Woods* v. *Kern County Mutual Bldg. & Loan Assn.,* 34 Cal.App.2d 468, 473-474 [93 P.2d 837]; see also *Verdier* v. *Verdier,* 118 Cal.App.2d 279, 283 [257 P.2d 723].) In any event, the contentions of the appellant herein are within the scope of the review under his appeal from the order denying his motion for a new trial. (See *People* v. *Burch,* 118 Cal.App.2d 122, 125 [257 P.2d 44].)

[2]In a publication of the United States Department of the Interior, Bureau of Land Management, which was received in evidence when offered by the appellant, it is said in part: ''Scrip is a paper or document issued under authority of an act of Congress, or a right acquired under an act of Congress such as soldier's additional rights, which authorized or entitled the legal owner or holder thereof to acquire public lands of the United States. . . . No scrip is issued today, nor has any scrip been issued since the Isaac Crow Scrip of 1907. . . . Scrip has been sold by the owners thereof, and by the dealers in scrip, for various prices per acre. No fixed or definite value can be placed on a particular piece of scrip because of many variable factors, such as the current demand for scrip, the possible place of locating the scrip, etc. The sale of scrip is strictly a private transaction between the buyer and the seller, and the Government has no interest therein, nor any control over the sales or the prices paid.''

of America. An item was received by the bank for collection. It had come from the Collins Land Company in Helena, Montana, and was for $249.50, upon payment of which by the appellant scrip for 4.99 acres was to be delivered to him. The sight draft was presented to the appellant; it was paid on July 15, 1957, by the use of a check for $1,000 issued by the Pachmayr Gun Works. That amount was used as follows: $248 was deposited to the account of the appellant; $500 was used for a cashier's check to the order of the appellant; $249.50 for a cashier's check in that amount in favor of the Collins Land Company; and $2.50 was retained by the bank as its collection charge. The witness said that the scrip was "probably" delivered to the appellant at or about that time, after the bank had received the money.

Mr. Mayhew testified that another item had been received from Stanley C. Benson for collection on October 4, 1955. Thereafter, a letter bearing the date of July 16, 1956, was received from Mr. Benson as to that item which amended the instructions to the bank. Thereunder, the bank was authorized to deliver certain documents to the appellant upon payment of the net amount of $10,240. Such documents included Valentine scrip bearing the designation E-272 and Valentine scrip designated as E-292.[3] In payment of the draft, two certified checks in the total amount of $20,500 were presented. One check was for $10,000 and the other for $10,500, each being dated July 16, 1957, and being drawn on the account of Pachmayr Gun Works. The sum of $20,500 was disbursed by the bank as follows: $10,240 was used in payment of the collection item; $10 was retained by the bank in payment of its collection charges; and $10,250 was deposited to the account of the appellant. In response to a question as to the reason why both checks were handled in the course of the collection since the check for $10,500 was more than sufficient to satisfy the collection demand and the collection charge, the witness said: "I think that as a matter of routine I just included the whole thing as part of the payment. . . . it may have been that I understood that the collection represented two different sources of money. . . . I don't know."

Mr. Mayhew further testified that on July 24, 1957, the appellant placed with the bank for collection a draft on Frank A. Pachmayr for $48,000, the appellant depositing Forest Lieu scrip for 162.487 acres to be delivered upon pay-

---

[3]E-272 was for 40 acres as was E-292.

ment of that amount of money. In payment the bank received a cashier's check for $2,000, dated July 24, 1957, issued by the Bank of America payable to the order of K. A. H. Christian and bearing an endorsement in that name, and a cashier's check for $46,000 issued by the Union Bank and Trust Company. The witness thought that Mr. Pachmayr came into the bank at the time the check for $46,000 was presented. The proceeds of the collection were disbursed as follows: $39,370 was deposited on July 24, 1957, to the appellant's account; $10 was retained by the bank as its collection charge; one cashier's check was issued to the order of one Richards for $6,120 and two other cashier's checks in the total amount of $2,500 were issued to the order of one Stack.

Mr. Benson testified to a transaction with the appellant, which started in 1955, with respect to Valentine scrip number E-272 and number E-292. The appellant said that he would buy the scrip, which he had previously sold, for $15,000, but he did not pay that amount. In 1955, the transaction was placed in the Bank of America as a collection item. The witness Benson said: "At that time he [the appellant] was buying the corporation and all the stock, and this was the principal asset, this scrip, and that was the $15,000 price." Ultimately, $10,240 was received for the scrip. The check was received by the witness directly from the Bank of America.

Margaret Chivers, who lived in Helena, Montana, testified that she was an officer of the Collins Land Company. In June 1957, she sent scrip for 4.99 acres to the Bank of America for delivery to the appellant upon payment of $249.50. In a letter of transmittal it was stated that if payment was not made by July 15, 1957, all papers were to be returned to the Collins Land Company. She did not recall how the transaction originated "but very likely it was by long distance telephone." It was her company's practice to send scrip to a bank for the collection of the sales price thereof. In 1955, she sold to the appellant scrip for 162.487 acres; she came to Los Angeles and delivered that scrip to the Bank of America. This was done pursuant to the appellant's request. The price of that scrip was $4,800, together with expenses of $208.52. That scrip was the scrip of the same acreage concerning which Mr. Mayhew testified.

Frank A. Pachmayr testified that he first met the appellant between July 5 and July 10, 1957. They were introduced by Karel Christian. The three men discussed the subject of scrip. Mr. Pachmayr testified as to his conversations with the

appellant, prior to his purchase of scrip, as follows: "A. Well, Mr. Maggart stated that he knew how some land scrip could be purchased at $300.00 an acre and he had some land located up in the Portland, Oregon area that could be, if we purchased this land scrip, had at $300.00 an acre. We could file on it in Washington, get title to the land scrip and then file on this land that he had located in the Portland, Oregon area and get back a minimum of $3,000.00 an acre. I asked him why he didn't file on this property up there himself and he said that he didn't have the money to purchase this land scrip and he told me that his part of the deal would be 50 percent of the proceeds after the timber was sold on this land. He also stated that he had three different companies up there that would buy the timber off of the land and there was over 700 acres of land up there available and that he had received a minimum offer of $3,000.00 per acre for the timber off of this land. . . . A. I do not believe at the very first conversation of the introduction of Mr. Maggart to myself through Karel Christian that the ownership of the scrip was discussed at all, merely that Mr. Maggart knew where there was some scrip that was for sale and it was owned by some people up in Montana. . . . A. At the first meeting I questioned Mr. Maggart as to why he didn't place the scrip on this land in Oregon himself and he said he didn't have the money to purchase the scrip, and he stated that his part of the deal was that he was to get 50 percent of the proceeds of the timber after it was sold and that it was part of the deal; Karel Christian was to put up a certain amount of the money and I was to put up the balance on the 4.99 acres; he was to put up $500.00 and I was to put up $1,000.00; when this land was sold it was our assumption or, I should say Mr. Maggart stated he would get a minimum of $3,000.00 an acre and then I felt if I would get back five times what I had put in it was a good deal." Mr. Pachmayr testified further that on July 13, 1957, the appellant "explained about this 5-acre piece of scrip and the immediate action that would have to be taken on it"; so Mr. Pachmayr communicated with his attorney, Maynard Henry, and arranged a meeting for Monday, July 15, 1957. At the meeting in Mr. Henry's office, the appellant said that the deal with respect to the 5 acres of scrip and the 40 acres of scrip at $300 an acre would have to be consummated on that day because, if that was not done, the scrip would have to be returned to Montana. As a result of this conversation, Mr. Pachmayr had

a check for $1,000 prepared and he gave the check to the appellant on July 15, 1957, "for my two-thirds share, payment against 4.99 acres of scrip." (The remaining one-third share was to be purchased by Mr. Christian.) In reply to a question as to whether he knew, at the time he delivered the check, that any part of the proceeds was to go to the appellant personally, Mr. Pachmayr answered: "No, the proceeds of this check was to go to the purchase of the scrip completely." While the witness could not say definitely that the statement was made that the scrip was in the Bank of America, he testified that: ". . . our checks were made out to the Bank of America for the scrip. . . ." The appellant told him how to make out the check for $1,000. Thereafter on the same day he received the scrip for 4.99 acres from the appellant. He believed that the appellant did not have the money to purchase the scrip for 4.99 acres. He believed the appellant's representation that lumber companies had bid $3,000 an acre on Oregon timberland when he delivered the check for $1,000 to the appellant.

Mr. Pachmayr further testified as follows: "Well, during that time he would tell me about the 40 acres of Valentine and another 40 acres of Valentine and the discussion held on that, at $300.00 an acre, and that he would have to have immediate action or he would have to send it back to Montana." On July 16, 1957, he had another meeting with the appellant. Mr. Christian was present. He gave the appellant two checks, one for $10,500 and another for $10,000, "to pick up the scrip at the Bank of America," being Valentine scrip E-272 and E-292. At the time he delivered these checks to the appellant, he continued to believe and rely on the earlier statements which the appellant had made to him as to the scrip. Mr. Pachmayr received the scrip E-272 and E-292 on the afternoon of July 16, 1957.

The third transaction which Mr. Pachmayr had with the appellant occurred on July 24, 1957. Before that transaction, the appellant stated that he had Forest Lieu scrip for 162.487 acres for sale at $300 an acre. The appellant never told Mr. Pachmayr that he owned any of the scrip himself. He said the scrip for 162 acres was in the main office of the Bank of America. Mr. Pachmayr was to pay $46,000 and Mr. Christian $2,000. A cashier's check for $46,000 was obtained by Mr. Pachmayr from the Union Bank on July 24, 1957, and was taken by him to the main office of the Bank of America and given to Mr. Mayhew. He had looked at the

scrip the day before with Mr. Christian and the appellant. He believed that, in his examination of the documents on that occasion, he noted the name of the appellant on one page as the president of the Funston Land Company, but he had no conversation with anyone about that. As to a conversation with the appellant in Mr. Pachmayr's office on July 23, 1957, and his reliance thereon, Mr. Pachmayr testified as follows: "A. Mr. Maggart stated that he had the scrip in escrow with the Bank of America, Main Office, and that we could make the same deal on it that we did on the rest of the scrip, namely, that we would get our proportional share; he would get 50 percent of the proceeds after the sale of the land and that he could place the scrip on forests in the Portland, Oregon area because there was over 700 acres of land up there, that he already had cruised and he had an offer by the different lumber companies of over $3,000.00 an acre. Q. Did you believe and rely on these statements at the time you gave him $46,000.00? A. Yes, I did." As to what occurred at the bank on July 24, 1957, Mr. Pachmayr testified: "A. As Mr. Mayhew, after he had met Mr. Maggart and Mr. Christian, my wife and myself at the counter, Mr. Maggart asked Mr. Mayhew to get this 162.487 acres of Forest Lieu scrip and Mr. Mayhew started to walk away to pick up the scrip and he was about twenty feet from us and Mr. Maggart called after him and he said, 'Isn't it $48,000.00 that they want for this scrip.' Mr. Mayhew half turned and looked at him . . . and he said, 'Yes, that is right. . . .' " The scrip was then delivered. Mr. Pachmayr also related efforts to place the scrip on land.

Three agreements were prepared in which the parties were Mr. and Mrs. Pachmayr, Mr. Christian and the appellant. One related to the scrip for 4.99 acres and Valentine scrip E-272 for 40 acres and was dated July 15, 1957. Another, bearing the date of July 15, 1957, was as to Valentine scrip E-292 for 40 acres. The third was dated July 24, 1957, and related to the last transaction. The agreement first mentioned is set forth in the footnote,[4] the portion italicized being the

---

"AGREEMENT

"THIS AGREEMENT, made and entered into this 15th day of July, 1957, by and between Frank A. Pachmayr and Nanitta G. Pachmayr, hereinafter known as Trustees, and Frank A. Pachmayr and Nanitta G. Pachmayr, husband and wife, Karel A. H. Christian, and Roy Maggart, hereinafter known as Beneficiaries:

"WITNESSETH:

"THAT WHEREAS, the Trustees and Karel A. H. Christian, as stated

portion added to the body of the document submitted by the appellant as hereinafter related. The other two agreements contained provisions similar to those in that agreement except that there was no specific designation of the property to be selected. Mr. Pachmayr testified: "A. Mr. Maggart had this document prepared in substance although my attorney, he made some changes in the document and I believe this document was typed up in my attorney, Mr. Maynard Henry's office. I will say that it was prepared before any check was made. The reason for my belief is that we had a meeting in Mr. Maynard Henry's office Monday morning, I am sure it was, and I believe this check for $1,000.00 was made in the afternoon." Mr. Pachmayr testified that the third agreement

---

below, have purchased forty (40) acres of Valentine land scrip #E-272, issued under Act of Congress of April 5, 1872 (17 Stat. 649) and 4.99 acres of Lieu Selection Rights, under Act of Congress of July 1, 1898 (30 Stat. 620), and as such Trustees are entitled to select lands which are unoccupied, unappropriated public lands, non-mineral in character,

"AND WHEREAS, the Beneficiaries are desirous of having said scrip result in a selection of public lands,

"NOW THEREFORE, in consideration of the above, it is agreed as follows:

"1. Said Valentine scrip shall be owned as follows: Frank A. Pachmayr and Nanitta G. Pachmayr 83-1/3% and Karel A. H. Christian 16-2/3%; and the 4.99 acres of Lieu Selection Rights shall be owned as follows: Frank A. Pachmayr and Nanitta G. Pachmayr 66-2/3% and Karel A. H. Christian 33-1/3%; which said ownership shall exist until the Department of the Interior has approved in writing the land to be selected which the parties hereto designate as the following property located in the State of Oregon:

Lot 1, Sec. 31, T. 12 S., R. 4 E., W. M., Oregon, consisting of 45.84 acres, more or less; *or such other land or lands which Trustees may decide upon;*

and after such written approval the beneficial interests in such land so approved shall be as follows: Frank A. Pachmayr and Nanitta G. Pachmayr, an undivided 18.62 acres, Karel A. H. Christian, an undivided 4.30 acres, and Roy Maggart, an undivided 22.92 acres;

"2. The Trustees shall be the applicants of the selection rights *represented by said scrip and at all times shall have the unbridled right to operate and manage any and all real property acquired by reason of said scrip, with the further right at any time, in their sole discretion, to sell the same at a fair and reasonable price. Upon such sale and realization of the sales price thereof, Trustee shall disburse the said moneys to the Beneficiaries as their interest may appear and, thereupon, the said trust shall terminate.*

"3. Roy Maggart guarantees legal title of scrip to be good in Trustees; otherwise, cost price of $12,000.00 for Valentine scrip and

---

*The italicized portion of paragraph 2 was in lieu of the following language in the document submitted by the appellant: "and thereafter shall represent said beneficiaries in the operation and management of the said acquired real property."

was prepared in the appellant's office because Mr. Christian said that they preferred that it be done that way since Mr. Christian and the appellant knew a Bud Parr and Mr. Henry was the attorney for both Parr and Mr. Pachmayr. In April 1958, the Pachmayrs, Christian and the appellant executed an agreement terminating the prior agreements except insofar as the respective rights of the Pachmayrs and Christian to the scrip were concerned.

On cross-examination, Mr. Pachmayr testified: "None of the money at all was to go to Mr. Maggart. The only interest was after the sale of the property." With respect to the last transaction, he testified: "Q. All right, in looking at it did you notice that the Funston Land Company was selling this to you and had signed on this substitute power of attorney . . . signed by the President, Roy Maggart? A. I probably noticed that but that wouldn't have made any difference as the President wouldn't hold it. The corporation would own it." At the bank he did not see the name and address of the appellant on a particular collection record; he made no inquiry as to who owned that particular scrip (for 162.487 acres). He further testified: "I never questioned who owned the scrip. I would believe that it would be correct that it wouldn't make any difference to me who owned the scrip." Mr. Pachmayr testified further that the scrip had been placed on property in Apple Valley.

---

$1,500.00 for the Lieu Selection Rights will be refunded, the cost being $10,000.00 to the Pachmayrs and $2,000.00 to Karel A. H. Christian for the Valentine Scrip, and $1,000.00 to the Pachmayrs and $500.00 to Karel A. H. Christian for the Lieu Selection Rights.

"IN WITNESS WHEREOF, the parties have set their hands and seals the day and year first above written.

| | |
|---|---|
| TRUSTEES: | Frank A. Pachmayr |
| | FRANK A. PACHMAYR |
| | Nanitta G. Pachmayr |
| | NANITTA G. PACHMAYR |
| BENEFICIARIES: | Frank A. Pachmayr |
| | FRANK A. PACHMAYR |
| | Nanitta G. Pachmayr |
| | NANITTA G. PACHMAYR |
| | Karel A. H. Christian |
| | KAREL A. H. CHRISTIAN |
| | Roy Maggart |
| | ROY MAGGART" |

[Acknowledgment]

Maynard B. Henry, an attorney at law, testified to a meeting in his office on July 15, 1957, at which the appellant, Mr. Christian, and Mr. Henry and his client, Mr. Pachmayr, were present. He stated in part as follows: "Mr. Maggart explained to me that he and Mr. Christian had been discussing for a period of over a week about the possible purchase by Mr. Pachmayr of two parcels of land scrip or two pieces of scrip representing parcels of land. . . . He further stated . . . that there was a Mr. Mayhew with the Bank of America in the Collection Department that had two parcels of scrip, one certificate representing approximately five acres and the other scrip being 40 acres of Valentine. . . . He stated that these were placed there for collection by the owners, that the owners of the scrip were individuals who resided in Montana and I think he identified the 4.99 as in lieu scrip or scrip for the 1898 Act I believe it was. The demand or the collection on the first parcel of 4.99 was in the sum of $1500.00, and that the collection or demand on the 40 acres of Valentine scrip was some $12,000.00. He explained to me that there [were] deadlines that Monday, the 15th, and that that day was the last day the scrip could be picked up and, in other words, it had a return as of that afternoon and that unless it was so purchased that it would be returned. . . . Mr. Maggart further amplifying the transaction and the reason he wanted Mr. Pachmayr to purchase both of these scrips was that he had found some 45 acres of land in the State of Oregon, land that was heavily timbered. . . . He stated that the land should average out, the value of the timber about $3,000.00 an acre. . . . Mr. Maggart stated that he thought that he might be able to get the extension of time as far as the 40-acre parcel until the next day and there was no further discussion on that. Mr. Pachmayr at one point in the conversation asked Mr. Maggart why he didn't buy this scrip and place it on the land. Mr. Maggart stated that he didn't have enough money to do so. Mr. Maggart stated to Mr. Pachmayr that he expected to show a profit out of this deal and that his profits were to be derived from the ultimate sale of either the timber or the land. . . . He stated that he expected to make no profit out of the deal unless the land could be obtained, the timber and/or the land sold at a profit. He had prepared and submitted a form of contract which I went over and subsequently made a few changes in that day. . . . The document was retyped in my office with some minor variations or changes from the original document as presented by Mr. Maggart."

Mr. Henry also testified as follows: ''Mr. Maggart stated that his only interest was to receive a share of the profit from the sale of the land and the timber thereon to be derived through the use of this scrip and that for his services in having this scrip recorded in Washington, after it was obtained and purchased, for locating the land and for having the land cruised and timber cruised, for processing and selection thereof and finding where title was obtained, that he would receive his profit out of that.'' The witness did not know of the purchase of the scrip for 162.487 acres and did not discuss it with Mr. Pachmayr before it occurred.

At a later point in his testimony, Mr. Henry supplemented his testimony as to the first conversation in his office, stating: ''I think I was to the point where the deadline for the purchase of the Valentine scrip, E-272, had been agreed that it could be put over until the next day. Mr. Maggart then told Mr. Pachmayr that there was an additional 40 acres of Valentine scrip in the bank also which could be acquired for $12,000.00. ... Mr. Pachmayr stated that if it was available that he would like to buy this also. . . . Mr. Christian said that he wanted to put $1500.00 in and it was at that point the same agreement was orally agreed to, pertaining to the placing of this scrip on land either in Oregon or elsewhere and that this also was owned and placed by others other than Mr. Maggart and that it was in the bank for collection for the same $12,000.00 and that Mr. Maggart was, he was on the first forty and on the 4.99 acres and that he was to receive his profits out of the sale of land or timber that were to be selected and that way get acquisition of title. . . .''

Nanitta Pachmayr, the wife of Frank A. Pachmayr, testified as to the conversation on July 15, 1957, at which the appellant, the Pachmayrs, Mr. Christian and Mr. Henry were present. She said that the forest lieu scrip for 4.99 acres and the Valentine scrip E-272 for 40 acres were discussed. Later in the conversation Valentine scrip E-292 was discussed. Mrs. Pachmayr testified in part as follows: ''Well, Mr. Maggart was discussing forest lieu scrip of the 4.99 acres at that time that could be applied to timber land up in Oregon and I believe it was 700 acres of timber land. . . .'' In response to a question as to whether the appellant said anything with respect to whether he would receive any profit from the purchase of the scrip, she stated: ''A. Not at this particular meeting. It was held at Mr. Maggart's office. We discussed the 50 percent if we applied the forest lieu scrip on property

or profits and Mr. Maggart was to receive 50 percent of the sale. Q. After the scrip was applied to the particular land, is that correct? A. Yes, sir. . . . Q. Was there anything as to whether or not Mr. Maggart was to receive any of the money you and your husband delivered to him? A. No."

With respect to the purchase of the scrip for 162.487 acres on July 24, 1957, Mrs. Pachmayr testified that the appellant, Mr. Christian, she and Mr. Pachmayr went to the Bank of America; the Pachmayrs had their check for $46,000. As to the occurrence at the bank, she testified: "We waited quite a while. Finally a clerk, Mr. Mayhew, arrived, and Mr. Maggart asked him, introduced us to Mr. Mayhew and told him we would like to have the scrip and then when he returned, as he left, he returned with the scrip. . . . At that time my husband presented the check and it was supposed to be for—we only had a check for $46,000.00 because Mr. Christian was supposed to give us the $2,000.00. It would make up to $48,000.00 and at that time Mr. Maggart asked that his check be [sic] $48,000.00 and Mr. Mayhew turned and hesitated and then said, 'Yes.'"

The appellant testified in his own behalf. As to his first meeting with Mr. Pachmayr, at which Mr. Christian was present, on July 13, 1957, he testified in part: "I said this would be their chance to get in on this scrip picture reasonably and I said my price on this scrip is $300.00 an acre; I have made two trips to Helena, Montana and I have to go to Washington directly, however I see a few people are buying it and I would like to follow through with the location and I have a very desirable location in Oregon which had been checked and proved and it looked very good from an airplane and it looked very good on the map." As to the discussion in Mr. Henry's office on July 15, 1957, the appellant testified in part: "Well, I told them that this 4.99 could take this land up in Oregon. I gave them a little description if they wanted to check it. . . . That was in Linn County of Oregon and I located the tract. . . . The property looked good as a potential spot to use scrip and I said that in my opinion that the land was good. I told them that I had talked to Mr. Fox, the President of the Cascade Plywood Company in Portland, and he had put a value of $3,000.00 an acre on it which is so. . . . Anyway I told them that the price for sale of that scrip was $300.00 an acre and that was the price I was charging for all scrip—I never varied. It was the same. I told them that it was the same price and if they wanted to buy it the price

was $300.00 an acre for every piece of scrip that I had. . . . I said I had 40 acres of Valentine scrip and that was very usable.'' He further testified that none of the checks was handed to him personally. As to the check for $1,000, he said he ''was present at the Bank of America when Mr. Christian presented the money.'' With respect to the ''two $10,000.00 checks,'' he did not recall being present when those checks were presented to the bank. But he was at the bank when the $46,000 check was given to the bank.

With respect to the transaction as to scrip for 162.487 acres, the appellant testified as to a meeting at the Pachmayr home as follows: ''Well, Mr. Christian said, 'Mr. Maggart has some additional scrip if you people are interested,' and Mr. Pachmayr expressed a desire to talk about additional scrip, and I said that I have a very, very valuable 162 acres of scrip that I had three or four months before and that I had personally gone up and inspected the base land. . . . The select rights were at the bank, that my price was $300.00 an acre and if they were interested in buying that scrip they could go to the bank and pay for it. I also told them at that time, and I forgot to tell you, that at a later meeting if they wanted assistance in their select rights that I would be glad to do it for a 50 per cent interest in the land to be obtained but that this dealing had nothing to do with the purchase of the scrip— that is a separate transaction. 'If you want my services, then that is what I charge.' '' Another meeting was held ''just prior to going over to the bank on the 24th of July'' at an office in the Bartlett Building. The appellant, Mr. Christian and the Pachmayrs were present. They then went to the bank and the appellant, after calling Mr. Henry's office and ascertaining that he was out of town, prepared the contract, ''using the form of what we did for the other deal.''

The appellant further testified: ''No one at any time at any of these meetings asked me what I was paying for the scrip.'' On cross-examination, his testimony was that he did not say that the scrip for 4.99 acres belonged to him. He further testified: ''. . . as a matter of fact, the scrip was at my collection at the bank and, being my collection, I had control over who had it; what was paid for it, and the use. . . . I said I had the scrip for sale which is the usual course of selling scrip by all scrip brokers in the United States.'' With respect to the figure of $300 an acre, he said: ''This is my sales price.'' He also testified as follows: ''Q. . . . You let it be known to the Pachmayrs that you were going to be work-

ing with them as a group to locate the timber land? A. Yes, absolutely. . . . After the purchase of the scrip." He denied that he made a profit of $750 on the $1,000 transaction, stating: "I made two trips to Helena, Montana, that cost $250.00 each, and one trip to Washington." When he talked to the Pachmayrs about the Valentine scrip, he told them that he "controlled and had the scrip." He was "to have an interest for processing the scrip through Washington, locating the scrip, and then when it was all done and the property had gone to patent," he "would get 50 per cent interest." He further testified: "Q. Did you ever tell them you were a broker in this or you were making a profit in this particular transaction? A. I did not discuss it one way or the other. Q. You led them to understand that your profit was to accrue at such time as the scrip was exercised, didn't you? A. Yes. Q. Right. You intended they rely on that? A. Correct, yes; . . ."

As this court said in *People* v. *Bateman*, 175 Cal.App. 2d 69, at page 76 [345 P.2d 334]: "It was the function of the trial judge in this nonjury case to determine what facts were established by the evidence. Before his conclusion can be set aside on review on the ground of insufficiency of the evidence, it must be made clearly to appear that on no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. We must assume in favor of the finding of guilt the existence of every fact which the trial judge could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the finding. If the circumstances reasonably justify the finding of the trial judge, our opinion that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the trial judge. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].)"

The felonious taking of property which is not one's own constitutes theft. Under section 484 of the Penal Code, a defendant may be convicted of grand theft upon proof of either larceny, embezzlement or obtaining property by false pretenses. (*People* v. *Martin*, 153 Cal.App.2d 275, 281 [314 P.2d 493].) "Although the crimes of larceny by trick and device and obtaining property by false pretenses are much alike, they are aimed at different criminal acquisitive techniques. Larceny by trick and device is the appropriation of property, the possession of which was fraudulently ac-

quired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession." (*People* v. *Ashley*, 42 Cal.2d 246, at p. 258 [267 P.2d 271].)

The appellant contends that the facts of the present case do not fit into any of the forms of grand theft. He asserts that "an ordinary innocent vendor-vendee transaction was erroneously construed to be a felony by the court below." On the other hand, the People assert that the evidence was sufficient to sustain the conviction under both the theory of false pretenses and the theory of larceny by trick and device. It is, accordingly, necessary to determine whether the evidence was sufficient to sustain the determination of the trial court on either theory.

In Fricke, California Criminal Law (7th ed.), it is said, at pages 288-289: "That form of larceny in which the taking is in secret and without the knowledge of the owner is easily identified, but larceny by trick and device and obtaining property by false pretenses are frequently so similar in the modus operandi employed by the swindler that, depending upon the conclusion which may be formed as to the intent of the parties, the crime may be viewed as either larceny or obtaining property by false pretenses and a verdict of conviction of either offense may be sustained. (*People* v. *Von Badenthal*, 8 Cal.App.2d 404 [48 P.2d 82]; *People* v. *Miles*, 19 Cal.App. 223 [125 P. 250].) In both offenses the victim is deceived into parting with his property by the fraud and deceit practiced by the defendant. . . . The basic test, however, is found in the intent of the owner. In false pretense cases the owner of the property turns it over to the defendant intending that the defendant shall become the unconditional and unrestricted owner thereof. In larceny by trick and device, however, the owner never intends that the property shall belong to or become the property of the defendant; he never intends to part with title to the defendant but merely turns the possession of the property to the defendant to be used by the latter in accordance with and for the purposes expressed in the conversations and agreement between the parties. The expression in some opinions that in larceny the owner never intends to part with title to the property is not strictly accurate; the rule is that he does not intend to part with the title to the defendant but this is not affected by the fact that he usually does intend that title to his property shall pass according to the plan or scheme proposed by the defendant and which he believes will be carried out. The larcenist, having obtained

possession of the property by representing a purely fictitious or misrepresented venture as real, at all times intends to steal the property for himself.''

In *People* v. *Barnett*, 31 Cal.App.2d 173 [88 P.2d 172], the defendant represented to a widow that he, the widow and one Amigo could buy a certain lease of 40 acres for $1,000 under an arrangement where each would furnish one-third of the cost. The land was to be bought in the names of the widow and Amigo and a separate agreement was to be executed to evidence the defendant's interest. In delivering her share of the money to the defendant, the widow intended and understood that the money was to be used in payment to a third person of the joint purchase price of the lease. She testified that she did not intend to part with the title to her money to the defendant. Prior to his meeting with the widow, the defendant had purchased the lease from another person for $40 and had caused the title to appear in the name of one Starr without the latter's knowledge or consent. He later secured Starr's signature to an assignment in blank and filled in the names of the widow and Amigo as assignees. In affirming the conviction of grand theft upon the theory of larceny by trick and device, the court said, at pages 176-177: ''The defendant and his codefendant represented that each of them was investing the sum of $333 together with Mrs. Hill as part of the purchase price of said lease, when in truth and in fact they already owned said lease, and instead of the purchase price being $1000, it was only $40. From a statement of the evidence which we have set forth it is clear and unequivocal that Mrs. Hill parted with the possession of the money to the defendant with the understanding that he would use her money in connection with money advanced by himself and his codefendant for the purchase from some third person of the oil lease. She did not purchase the lease from the defendant or Amigo and therefore never passed title of such money to the defendant or to Amigo.''

In *People* v. *Delbos*, 146 Cal. 734 [81 P. 131], the evidence tended to show that the defendant undertook to buy a lodging-house for her cousin; defendant learned that one could be bought from one Stalford for $90, but represented to her cousin that the price was $500; the cousin had the defendant obtain $400 from another person who was in possession of some money belonging to the cousin; the defendant obtained the money, but retained for herself the amount above the actual

purchase price. The court said, at pages 736-737: "In the case at bar, at the time Mrs. Marquet delivered the money, or caused it to be delivered to the defendant, she did not intend then to part with her property in the money to any one. Her intention was that the defendant should receive the money from Mrs. Janzi for her, carry it to Mr. Stalford, the seller, and then pay it to Mr. Stalford on behalf of Mrs. Marquet. If this had been done as intended, the money would have remained in law the property of Mrs. Marquet until its final delivery to Mr. Stalford in payment of Mrs. Marquet's debts on the purchase price of the house. The title thus remaining in Mrs. Marquet, it was subject to larceny as of her property, and the fraudulent appropriation by the defendant to her own use, she having had the intention from the beginning to obtain it for that purpose, constituted, in law, an act of larceny."

In the light of the applicable law, the trial court in the present case was warranted in reaching the conclusion that, as to each transaction, the appellant was guilty of larceny by trick and device. ▆ Inherent in that crime is the employment of fraud and trickery in the obtaining of possession of property by one who has a preconceived design to appropriate such property to his own use. (See *People* v. *Bartges,* 126 Cal.App.2d 763, 770 [273 P.2d 49]; *People* v. *McCabe,* 60 Cal.App.2d 492, 496 [141 P.2d 54]; *People* v. *Sing,* 42 Cal.App. 385, 391 [183 P. 865].) ▆ The requisite intent is rarely susceptible of direct proof and ordinarily must be inferred from a consideration of all the facts and circumstances shown by the evidence. (*People* v. *Collins,* 172 Cal.App.2d 295, 299 [342 P.2d 370]; *People* v. *Edwards,* 72 Cal.App. 102, 117 [236 P. 944].) ▆ If the evidence is sufficient to justify a reasonable inference that such intent existed, a finding thereof by the trier of fact cannot be disturbed on appeal. (*People* v. *Lyles,* 156 Cal.App.2d 482, 486 [319 P.2d 745].)

▆ In the first transaction, the appellant represented to Mr. Pachmayr that scrip for 4.99 acres was for sale for the price of $1,500, whereas in fact the scrip was held in the collection department of the Bank of America to be delivered to the appellant upon payment of $249.50 and collection charges of $2.50. The appellant submitted a document to be signed by all of the parties which lent support to his assertion that his only financial interest was in the profits which would result from the obtaining of land by use of the scrip. The fact

was that he was to obtain for himself $748 of the $1,000 supplied by Mr. Pachmayr. The fraudulent statements and representations as to the price for which the property could be obtained and of the nature of the appellant's interest in the transaction, and the document purporting to define such interest, constituted the devices used by him to carry out his scheme. (See *People* v. *Lafka,* 174 Cal.App.2d 312, 314-315 [344 P.2d 619].)　　It is, of course, true that the misrepresentations of the accused must have induced action in reliance thereon. (See *People* v. *Lafka, supra,* at p. 315.) But it is not essential that there be express testimony by the victim that he was induced to part with his money by the false representations of the accused as long as the inference of such reliance can be drawn by the trier of fact from the evidence. (See *People* v. *Schmidt,* 147 Cal.App.2d 222, 228 [305 P.2d 215].)　　However, in the present case Mr. Pachmayr testified that at the time he gave the appellant the checks for the second transaction, he *continued* to believe and rely on the earlier statements as to the scrip which the appellant had made to him. The evidence clearly warranted the inference that Mr. Pachmayr did not know or intend that the appellant would be the recipient of any part of his money.

The fact that the check for $1,000 was made to the order of the Bank of America is of no aid to the appellant. Even though the check went into the bank, the proceeds were in large part under the control of the appellant. (*Cf. People* v. *Schmidt, supra,* 147 Cal.App.2d 222, 228.) It is obvious that it was part of the appellant's scheme that while the bank should appear to be merely an agent for collection (as it was to the extent of the amount of the draft of the Collins Land Company on the appellant), it would in fact be used by him as the instrument or means by which to accomplish the diversion to him personally of the major portion of the proceeds of the check.

Even if the scrip had a value commensurate with the cost thereof to Mr. Pachmayr, the trier of fact was warranted in finding that the appellant had committed the crime of larceny by trick and device. (*People* v. *Robertson,* 167 Cal. App.2d 571, 576 [334 P.2d 938].)　　Whether the offense take that form or be the related crime of obtaining property by false pretenses, as stated in *People* v. *Pugh,* 137 Cal.App.2d 226, at pages 232-233 [289 P.2d 826] : ''Even if property is worth the consideration paid therefor, this is not a defense

where there is substantial evidence, as in the present case, that defendant knowingly made false representations with the intent to defraud and with the purpose and effect of inducing the prosecuting witness to part with something of value. (*People* v. *Raines*, 66 Cal.App.2d 960, 962 [153 P.2d 424].)''

The evidence was sufficient to support an inference that the fraudulent representations made by the appellant during the course of the first transaction were of such a nature that they continued to operate upon the mind of Mr. Pachmayr and induced action on his part with respect to the other transactions. (*People* v. *Ashley, supra,* 42 Cal.2d 246, 273; *People* v. *Rabe,* 202 Cal. 409, 413 [261 P. 303].) The second transaction was of the same nature as the first; by his scheme the appellant personally obtained $10,250 of Mr. Pachmayr's money. The third transaction varied from the other two in that the Pachmayr check was delivered directly to the bank. But, as heretofore noted, the appellant so arranged the matter with the bank that the proceeds were entirely under his control and the bank was merely his instrumentality for the obtaining of possession of Mr. Pachmayr's money. While the scrip for 162.487 acres appears to have been owned by the appellant, he did not disclose that this transaction was of a nature different from the represented nature of each of the previous transactions. To have done so would have thwarted his scheme. It is true that Mr. Pachmayr noticed that the appellant's name appeared as the president of the transferor of the scrip, but Mr. Pachmayr was reasonably justified in his assumption that, as he testified, the ''corporation would own it'' and ''the President wouldn't hold it.'' Moreover, the false picture was maintained when at the bank the appellant called after Mr. Mayhew and said, ''Isn't it $48,000.00 that they want for this scrip,'' and Mr. Mayhew replied, ''Yes, that is right. . . .'' The representation that the appellant had no financial interest in the transaction, except a share of any profits resulting from the use of the scrip in obtaining land, remained in full force and effect, and was reemphasized by the written agreement prepared as to the scrip for 162.487 acres. (*Cf. People* v. *Barnett, supra,* 31 Cal.App.2d 173.)

No corroboration is necessary to sustain a conviction of grand theft by trick and device. (*People* v. *Lafka, supra,* 174 Cal.App.2d 312, 316.) Since the evidence in the present case was sufficient to prove the commission of that form of grand theft, it is not necessary to determine whether it was

also sufficient under the theory of obtaining property by false pretenses. However, it may be noted that under the latter theory there was ample corroboration of the pretenses of the appellant as to the nature of the purchases and of his interest therein. (*Cf. People* v. *Andrews,* 165 Cal.App.2d 626, 639-640 [332 P.2d 408].)

 The conclusions which have been stated herein are not affected by a further contention of the appellant which remains for discussion. During the cross-examination of Mr. Pachmayr he testified that Bud Parr had been a personal friend of his since 1935, but he did not know in what business Parr was engaged. He further testified that Parr was also a client of his attorney, Mr. Henry. But Mr. Pachmayr did not know that Parr was interested in litigation between the state of California and the county of Orange. He did not know that Mr. Henry was interested in the outcome of that litigation. Thereafter, Mr. Pachmayr was asked: "Now did you know that Mr. Maggart was called as a witness by the Attorney General of California for a deposition on July 6 and 7, just two days before he was arrested on your complaint in this case?" The objection of the People was sustained after counsel for the appellant had stated that his purpose was "to show through this witness and others that two days after the Attorney General had called Mr. Maggart as a witness against Bud Parr that Mr. Pachmayr, Mr. Henry's client, had Mr. Maggart arrested and I am trying to develop this through this witness . . . to show the bias of this witness and Mr. Henry and others because Mr. Maggart took the State's side and testified about Mr. Bud Parr's activities. . . ." The ruling is alleged to have been erroneous.

In determining the merits of such contention, it is necessary to note certain testimony of Mr. Henry while under cross-examination. He testified that Bud Parr was his client but he did not know whether Parr was a stockholder in the American Marine Exploration Company. He did not know that the appellant "was a witness in a deposition taken in the litigation" between the county of Orange and the State of California or that he had mentioned Bud Parr or Orange County officials in the course of that deposition. He had never heard of the deposition although he had heard of the litigation. He was then asked the following question: "Have you heard that Mr. Maggart was a witness for the State?" The People voiced an objection; during the course of the argument with respect

thereto, statements were made as disclosed in the following excerpt from the record: "MR. KENNY [counsel for the appellant Maggart]: I am trying to show bias of this witness . . . that he had a client, a Mr. Parr . . . and that Mr. Maggart took a position in the litigation antagonistic to his client, Mr. Parr, and that this witness' testimony is stimulated by a desire to get a conviction of Mr. Maggart; that Mr. Maggart could not be used in the trial to testify as effectively against Mr. Parr and others with whom he was associated and that is what I am trying to show. . . . THE COURT: Well, I ruled that out yesterday but I have been looking at it since and I am going to overrule it. I ruled it out in Mr. Pachmayr's testimony. MR. KENNY: I think that is right on Mr. Pachmayr. . . ." The objection was overruled. The witness, Henry, answered: "Your Honor, to answer that, I must qualify. I have seen numerous reports and have heard that Mr. Maggart was subpoenaed for an appearance before the Grand Jury. Now whether that is an answer that I knew and whether that pertains to this action civilly or not, I do not know but that is the only knowledge that I have or had had concerning Mr. Maggart's appearances in any litigation."

The nature of the situation presented in this case is similar to that discussed in *People* v. *Schmitt*, 155 Cal.App.2d 87 [317 P.2d 673], wherein the defendant sought to show that he was being persecuted for his scientific beliefs and that the American Cancer Society and others were conspiring to put him out of business. This court said, at page 104: "Certainly great latitude should be allowed in cross-examination for the purpose of showing the state of mind of a witness, his interest in the case and his bias and prejudice. However, the court may and should limit the cross-examination of witnesses in order to confine it within reasonable bounds and curtail digressions which serve no purpose as proof of any disputed material fact in the case. (*People* v. *Lantz*, 120 Cal.App.2d 787, 791 [262 P.2d 19].) Since the witnesses denied knowing Mrs. Reed and denied having any control over the funds of the cancer society, we do not believe that the line of questioning proposed by defendant, if permitted, would have been advantageous to him, or that he suffered any disadvantage or prejudice through the rulings of the court." In the present case, it is difficult to see how the trial court's ruling, even if erroneous, caused any prejudice to the appellant in view of the testimony of Mr. Pachmayr which preceded the unanswered question and in the light of the testimony of Mr. Henry.

The judgment and the order denying the appellant's motion for a new trial are affirmed.

Shinn, P. J., and Bishop, J. pro tem.,* concurred.

A petition for a rehearing was denied August 11, 1961, and appellant's petition for a hearing by the Supreme Court was denied September 13, 1961. Schauer, J., was of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.