[Crim. No. 8813. Second Dist., Div. Two. Aug. 14, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK FINLEY, Defendant and Appellant.

Frank Finley, in pro. per., and Nathaniel J. Friedman, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and H. Warren Siegel, Deputy Attorney General, for Plaintiff and Respondent.

ASHBURN, J.—Defendant appeals from a conviction of murder of Marguerite M. Eggleston, the offense being fixed as second degree; also from order denying motion for new trial. Through court-appointed counsel appellant presents five claims of prejudicial error for our consideration.

 It is asserted that it was error to permit the autopsy surgeon to detail his "surgery" because of the "highly inflammatory" nature of the evidence. Counsel says in his brief: "It added nothing to the prosecution's case by way of demonstrating how death occurred, nor did it in any manner link the defendant with the crime, merely on the basis that the body had certain cuts and bruises, which were admitted to be of indeterminate age." In this counsel errs. As shown in our discussion of sufficiency of the evidence *infra*, the issue of cause of death was in such evidentiary shape that the autopsy surgeon's findings were necessary to and highly persuasive

of his conclusion that death of the victim was caused by acute bile peritonitis due to laceration of the liver precipitated by a very severe blunt force, a laceration which could have been caused by fists or kicking, the principal laceration being in the right lobe of the liver. His testimony filled a need for a definite showing as to the technical cause of death and tended directly to corroborate the testimony of Mrs. Carol Gordon, who was the only eyewitness to the beating and kicking which was administered to decedent by appellant. This evidence was also important to establishing the prosecution's theory that the killing was a felony murder occurring in the commission of an assault "by any means of force likely to produce great bodily injury" (Pen. Code, § 245).

■ Photographs of the body of deceased of which appellant complains were not inflammatory and were a proper contribution to the proof of the cause of death. In effect, the jury found that it was caused by the beating given decedent by appellant. ■ The same is true of the diagram made by the autopsy surgeon while on the stand illustrating his testimony as to the many injuries sustained by decedent shortly before the autopsy.

*People* v. *Burns,* 109 Cal.App.2d 524 [241 P.2d 308, 242 P.2d 9], cited by appellant, is not persuasive here for the facts are radically different. That opinion says, in part, at page 541, concerning the photographs: "They were particularly horrible. . . . The completely bald head, the surgical cuts and sutures, the ugly punctures, the inverted lips with the instruments attached, make the body so grotesque and horrible that it is doubtful if the average juror could be persuaded to look at the pictures while the witness pointed out the bruises and abrasions."

■ A similar contention of appellant is that the court erred in permitting Dr. Wilkinson, a physician attached to the County General Hospital, to testify to the meaning of certain X-ray reports which had been made by a roentgenologist, and that he was permitted to detail gruesome surgical details which did nothing but inflame the jury. While the X-rays were made under the doctor's direction and control and were interpreted by the roentgenologist who rendered a report, the doctor's testimony did not consist of interpreting the X-rays. It was directed primarily to an explanation of the condition of decedent when she arrived at General Hospital on July 6 at 12:21 a.m. His testimony was largely the same as

that of the autopsy surgeon with respect to injuries which had been received by the victim.

Particularly he observed acute bile in the liver, bruises in the left lower portion of the abdomen. On a second examination the sounds in the abdomen had changed. It had become swollen and signs of peritoneal irritation were present, so she was taken to surgery. There the witness found that she had a deep tear of the upper surface of the liver which was oozing bile and blood; also a tear in the suspended ligament of the small bowel and another in the ligament of the large bowel; a large amount of blood in the abdomen. The lacerations of the liver were on top and down behind and there were several small ones underneath the gall bladder. The major laceration was 8 to 12 inches above the navel and the bruises of the lower abdomen were below the waistline. There was no impropriety in the admission of this evidence even if it were gruesome and inflammatory. It was part of the legitimate proof of the savage assault made upon decedent by appellant, which was the heart of the case.

■ Claim is made that the X-rays were not available to defendant for pretrial inspection. It fairly appears they were not in the possession of the prosecution but of the hospital. There is no indication that defense counsel had made any effort to inspect them prior to the trial. When the point was raised the judge gave counsel time to examine them and she thereafter announced: ''I have looked at them extensively and to my satisfaction.''

■ The sufficiency of the evidence to sustain the verdict of murder in the second degree plainly appears from a reading of the reporter's transcript. There were but two eyewitnesses to the crucial events preceding the Eggleston death—Mrs. Carol Gordon and defendant. He was the only witness called by the defense upon any phase of the case. The police officers who arrived shortly after the beating furnished circumstantial evidence supporting Mrs. Gordon's version of the matter.

■ We must, of course, accept as established the evidence which favors respondent's position (*People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911]), and consider as rejected by the jurors that which contradicts the evidence supportive of the conviction.

■ Mrs. Gordon, who was a stranger to both Marguerite Eggleston and defendant, had been living at apartment 210 at 1220 South Harvard, in Los Angeles, for only three weeks before July 5, 1962, the date of the crime. The

Eggleston apartment was number 206. Mrs. Gordon was home alone on that evening and at about 10 to 10:30 p.m. her attention was attracted by a noise like a door slamming and hearing a ''holler,'' ''no, Frank, no, Frank.'' She went outside her apartment into the hallway. There she saw a man, later identified as appellant, beating ''this lady,'' holding her and kicking her across the face and beating her around the face with his fists, striking her with one hand and then the other. He looked toward Mrs. Gordon, so she went inside for about two minutes; she then opened the door and Finley was still beating the woman. At that time she was lying on the floor of the hallway, he was looking over her and beating her with fists and kicking her; the beating and kicking were continuous; the blows landed around her head and neck and above her waist. Defendant left, going downstairs. Mrs. Gordon asked Eggleston if she could help her, heard the downstairs door slamming and as defendant was coming up the stairs he motioned Mrs. Gordon toward her own door; as she left defendant was kicking his victim. Defendant left again. Mr. Gordon came home, was told what had happened and, having no telephone, went next door to call the police. Defendant came back upstairs and asked: ''What happened to you? Who did this to you? How did you get out here?'' (Although the record is not clear, these remarks seem to have been addressed to Eggleston.) Mrs. Gordon returned to her apartment and as her husband was doing so defendant picked Eggleston up and took her inside her apartment. The Gordons closed their door but she heard bumping and talking and once heard defendant say ''he loved her.''

The first time Mrs. Gordon saw them defendant was striking Eggleston around the face and neck; the second time she saw him hit her across the face and upper part of the body and saw him kick her but could not say whether it was around the lower part of her body. Mrs. Gordon saw that the middle panel of the door to apartment 206 was out. She heard no screams or cries from Eggleston but when she was lying in the hallway she was moaning.

Police Officer William H. Williams arrived with Officer Van de Veer about 10:45 p.m. He testified that the door was closed but the center wooden panel was completely out. He looked through the hole and saw Eggleston standing about 3 feet inside and holding a towel or a rag to her face; she had blood stains on her and a swelling about the left eye. Defendant was standing directly behind her. The officer

walked in and asked her who had done this to her. She pointed to defendant and said he did it. Defendant made no response. Then the officer arrested him.

In the police vehicle in front of the building defendant said he had followed Eggleston to the building and asked to be admitted; she refused and he then hit the door with his right fist and knocked out the center panel; the whole door fell on Eggleston and he fell on the door as it landed on her and that caused her injuries. The officer did not examine the hinges of the door but he did open it with no unusual motion when he entered. Defendant did not say anything about decedent having called him that day. He said he had lived with her in January and had followed her to see if she was living with another man.

Later at the receiving hospital the officer saw a small laceration on defendant's right hand. He said he received it as he knocked the door in. "I only hit the deceased a couple of times." This was his first mention of striking her. There was a slight odor of alcohol about defendant but he was not intoxicated.

Officer Van de Veer, who arrived with Williams, had no conversation with defendant until about 11 p.m. Defendant said he had lived with the victim in Pasadena, she left him, he followed her to 1220 South Harvard, found out where she lived and wanted to know if she was living with another man and so went to see her. He thought she was living with another man. He denied hitting her. He said he banged on the door, it fell down on top of her and he fell on her; he said he hit her with the door. Defendant also asserted that the woman was no good and he thought she was living with a queer.

█ There was considerable in the cross-examination of the two officers, especially about the preparation and contents of their notes and their report, that raised questions of their credibility, but that matter was decided by the jury in favor of their testimony, which fact precludes any successful attack upon the credibility of the officers at this time. Their testimony cannot be rejected here as incredible. █ "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] █ To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impos-

sibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.]
Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]'' (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758].)

The jurors were entitled in their discretion to accept or reject all or any part of the testimony of defendant or any other witness. (*People* v. *Matlock,* 51 Cal.2d 682, 695 [335 P.2d 505, 71 A.L.R.2d 605]; *Nevarov* v. *Caldwell,* 161 Cal.App.2d 762, 777 [327 P.2d 111]; *La Jolla Casa de Manana* v. *Hopkins,* 98 Cal.App.2d 339, 345-346 [219 P.2d 871].) Actually, it seems that the testimony of the officers was found persuasive by the jury and that they accepted it in preference to most of defendant's own story.

Defendant's testimony attempted to offset all of the foregoing evidence. He stated positively that he did not hit or kick Eggleston. He is 6 feet 3 inches tall and weighs 190 pounds. His victim was probably 5 feet 5 or 6 inches tall. He said he was in love with her and they had lived together in Pasadena but she left him on May 28, 1962, and went to Los Angeles and he did not know her address. She called him three or four times but did not say where she was living. On July 5th she called him three times and told him to come over because she was feeling bad. He arrived about 9:30 p.m. and knocked; she said ''Yes,'' and then ''Wait just a minute'' and came toward the door; it sounded like she was drunk or something; her words were all mumbled together. Defendant asked her to open the door; she said ''wait'' and ''so she got up to the door and that is when I hit the door'' two times. Defendant was trying to knock the door down so as to get in and see what was wrong with her. First the panel gave in, then the door fell and he fell on it; the door broke, it fell, he fell on top of it and the door fell on the front of her.

The theory here suggested and definitely pursued in the cross-examination of the autopsy surgeon was that the door knob must have struck her in the liver area and caused the fatal tear. Defendant said that both of them got up right away, she held on to him and he gave her a rag to put over a cut on her eye. She complained of nothing but her eye.

The police arrived in 15 to 20 minutes and the door was half cracked and open. "I was kind of close so I could swing." The police asked who broke the door and Eggleston said defendant did. When he arrived there she was groaning and he rushed in to see what was wrong with her. He first hit the door with his fist and then "with all fours," but did not knock the hinges off, the panel flew open and he fell on it and then on her. "Q. Well, this was a normal door, wasn't it, when you reached in and grabbed the handle and opened it up? A. Yes." (Out goes the door knob theory.) "Q. And then when you got in you started to beat her and kick her, isn't that right? A. Yes."

The jury which convicted defendant of second degree murder well may have concluded that decedent was defendant's paramour who had left his bed, moved from Pasadena to Los Angeles and concealed her address from him; that he searched her out and without any invitation arrived at her apartment and demanded admittance which was refused. Suspicious that she was living with another man he attempted to knock the door down, did knock out a panel which did not fall on her; the door did not fall on her at all and defendant did not fall on her; he opened the door in a normal way, grabbed her and dragged her to the outside hallway, while she yelled "No, Frank. No, Frank." There he beat and kicked her inflicting many injuries, kicked her in the liver, which lies just below the rib cage, and inflicted a tear of the liver which led directly to her death; that there was no proximate cause of same except the beating and kicking inflicted by defendant.

Defendant was charged with first degree murder but there was no proof of premeditation and hence the crime could only be second degree or less.

Appellant's present counsel argues that it was misdemeanor manslaughter at most. *People* v. *Thomas,* 25 Cal.2d 880, 895 [156 P.2d 7], says: " 'When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.' "

Penal Code section 188, provides: *"Malice Defined.* Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

The evidence at bar would justify a finding that there was express malice in defendant's mind when he kicked and beat decedent so unmercifully; also that there was no "considerable provocation" and that there were circumstances showing "an abandoned and malignant heart." ▪ "Even though a deliberate intention to kill is absent, if 'no considerable provocation appears' or 'the circumstances attending the killing show an abandoned and malignant heart,' malice will be implied. [Citations.]" (*People* v. *Bufarale,* 193 Cal. App.2d 551, 561 [14 Cal.Rptr. 381].)

The point to counsel's claim that this at best was a misdemeanor manslaughter lies in the fact that the prosecution contended for a murder growing out of an assault by "means of force likely to produce great bodily injury" (Pen. Code, § 245), an offense which can be committed by use of the fists or by kicking the victim. (1 Witkin, California Crimes, § 272, p. 256; *People* v. *Tallman,* 27 Cal.2d 209, 212 [163 P.2d 857]; *People* v. *Zankich,* 189 Cal.App.2d 54, 69-70 [11 Cal.Rptr. 115]; *People* v. *Carnavacci,* 119 Cal.App.2d 14, 16 [258 P.2d 1127]; *People* v. *Hooker,* 130 Cal.App.2d 687,.691 [279 P.2d 784].) But the punishment as prescribed by the statute, section 245, is "imprisonment in the State prison not exceeding ten years, or in a county jail not exceeding one year, or by fine not exceeding five thousand dollars, or by both such fine and imprisonment." Counsel's argument is that in the absence of a proven intent to inflict great bodily injury the assault is only a misdemeanor. However, the rule is that specific intent is not essential to the offense. (*People* v. *Schmidt,* 66 Cal.App.2d 253, 256 [152 P.2d 1021]; *People* v. *Lim Dum Dong,* 26 Cal.App.2d 135, 140 [78 P.2d 1026]; 1 Witkin, California Crimes, § 271, p. 255; Fricke on California Criminal Law (7th ed.) p. 186.) The use of the described force is what counts, not the intent with which same is employed. Parenthetically, we point out that in this instance the intent, if important, would readily be inferred from the conduct of defendant as proved by the prosecution.

An offense which is punishable by imprisonment or confinement in the county jail is and remains a felony until the court sentences defendant to the lesser punishment. Section 17, Penal Code, says: ". . . When a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment imposing a punishment other than im-

prisonment in the state prison. . . ." This language has been construed uniformly to mean that the felony aspect of the crime remains until sentence is imposed for a misdemeanor and if no sentence is ever pronounced the offense remains a felony at all times. (*People* v. *Banks,* 53 Cal.2d 370, 381-382, 386 [1 Cal.Rptr. 669, 348 P.2d 102]; *People* v. *Boyce,* 99 Cal.App.2d 439, 445 [221 P.2d 1011]; 14 Cal.Jur.2d §§ 18, 19, pp. 203-205; 1 Witkin, California Crimes, § 41, p. 44.)

█ Respondent's theory that this was a felony murder (committed in perpetration of a felony other than those enumerated in section 189, Penal Code; see 25 Cal.Jur.2d § 45, p. 542), requires that the assault upon decedent be a felony rather than a misdemeanor. In the circumstances of such a case as the one at bar—assault by force likely to produce great bodily injury—there is no opportunity for the offense to be converted into a misdemeanor for there is no separate prosecution for the assault and no occasion or opportunity to impose a sentence or to thus convert the felony into a misdemeanor. For the purpose of the instant prosecution the infliction of such an assault is a felony and can be nothing less.

█ We do not overlook the fact, aside from the prosecution's felony-murder theory, that the viciousness of the assault made upon decedent by appellant would afford sufficient basis for a finding of actual malice, thus warranting the verdict of second degree murder regardless of the felony-assault theory.

█ A related contention of appellant is that the trial judge erred by adding to CALJIC instruction number 601 (not 602 as asserted by appellant's counsel) the words "Simple assault is a. misdemeanor, whereas assault by means of force likely to produce great bodily injury is a felony." The instruction as thus modified is set forth in the footnote.[1] There was no error in this instruction or in the addition of

---

[1]"'Every person who commits an assault upon the person of another by means of force likely to produce great bodily injury is guilty of a crime. The essential characteristics of this offense is that the assault be committed by such means, used in such a manner and with such force, as are likely to result in severe bodily injury. It is not necessary to the completion of the crime that an assault actually result in bodily injury, but, if such injury is inflicted, its nature and extent are to be considered in connection with all the evidence in determining whether or not the means used and the manner in which they were used were such that they were likely to produce great bodily injury.

"'Simple assault is a misdemeanor, whereas assault by means of force likely to produce great bodily injury is a felony.''

the words to which counsel objects. In fact, they made the instruction more favorable to defendant than he was entitled to have.

Finally, appellant's counsel argues that Officer Van de Veer was permitted to testify over objection to a conversation of defendant with his brother officer which he actually did not hear, and to an "imaginary conversation" between himself and defendant. We have examined the record bearing upon this argument and find no merit in it.

The judgment is affirmed; attempted appeal from order denying new trial is dismissed.

Fox, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 9, 1963.