[Crim. No. 4331. First Dist., Div. One. Feb. 17, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD JAMES LESLIE, Defendant and Appellant.

Marvin W. Friedman, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant Edward James Leslie was charged in the first count of an information with the murder of his daughter Susan (Pen. Code, § 187) and in a second count with assault with intent to commit murder (Pen. Code, § 217) committed upon the person of his wife Louella. A court, sitting without a jury, found him guilty on both counts, fixed the degree of murder under the first count as second degree (Pen. Code, §§ 189, 1192), and sentenced defendant to the state prison on each count, the sentences to

run consecutively. He appeals from the judgment of conviction.

Defendant and his wife Louella (now Louella Ligon) were married in 1955 and divorced in 1961. In August of that year defendant was granted an interlocutory decree which among other things awarded to Louella, who did not contest the divorce, custody of their two children Brenda and Susan. In the following December the parties resumed living together in an apartment in San Leandro which they shared until about February 12, 1962, when they again separated. Just prior to this separation, an argument had arisen between them culminating in an incident during which defendant shot a gun out of a window. Louella testified that she then left defendant, taking Susan with her, because she was afraid of him.

On February 18, 1962, Louella and her two children were staying at the home of her parents, Mr. and Mrs. Henry Spence, in Hayward. Brenda was then 5 years old; Susan was 3. On that day Louella and her mother had accidentally met defendant in Hayward at which time Mrs. Spence told him he could visit his children that night if he wanted to.

Defendant arrived at the Spence residence at about 9 or 10 p.m. The children were then ready for bed. He sat in the living room with them, held them on his lap and gave them some candy. At some time thereafter, not clear from the record, the children were put to bed. Louella's father arrived home from work about 11 p.m.

After defendant was there about two hours, Louella herself started to get ready for bed. While she was changing her clothes in her mother's bedroom, defendant entered and asked her if she thought she would ever take him back. During the ensuing conversation, defendant told her that he would rather see her dead than married to anyone else. Louella then went into another bedroom where she slept in the same bed with Susan. Defendant followed her there but left almost immediately when she told him that he would awaken his daughter.

By this time Louella was in bed with Susan. This bed was located along the north wall of the room; its head was against the east wall. There was another bed in the room similarly placed along the south wall. Between the two beds and at the approximate center of the east wall was a chest of drawers. Photographs of the room received in evidence and now before us disclose that the distance between the beds was

just about the width of the chest, the head of each bed abutting a side of the chest. There was testimony that the beds were about three feet apart. The entrance to the room was in the southwest corner. Except for a small additional area near the doorway, the room was of modest if not small size, being approximately 10 feet wide along an east-west axis and 11½ feet long along a north-south axis. From the testimony, the diagrams, and especially the photographs, we apprehend the room, especially that area with and between the beds, to be rather "crowded" by the furniture.

Within a couple of minutes, defendant returned to the bedroom, turned on the lights and sat on the bed next to Louella who was lying on the outside. Susan was next to the wall, lying on her side and facing her mother. Louella told defendant that he had better go home since he had to work the next morning. He replied that he was "not working anymore" and in explanation of his remark handed her a note. Reading it, she saw that it stated he was going to kill her and then himself. She was still lying in bed but propped up on her left arm. She told defendant to leave her alone and that she was going to have him arrested. As she did so, she saw him pull a gun out from his belt. Louella jumped out of bed and started screaming. She told him "No, don't" but he said "[i]t is too late now."

At this point the testimony is in conflict. Louella testified that when she jumped out of bed, defendant was standing between the two beds and "facing sort of" the second bed and the chest of drawers between the beds. She "went around behind him" and ran to the door which was shut. Just as she grabbed the knob she felt the sting of a bullet on the left side of her neck "and then another real sharp pain in my shoulder." The shot or shots threw her "back between the beds." According to the diagram which she marked at the trial, this spot was close to the foot of the second bed (against the south wall).

According to the statement taken from defendant and introduced into evidence,[1] Louella had jumped off the bed and the pair were close together when he fired the gun at her. When he fired the first shot she was standing alongside the bed between him and the bed and he was firing at her in the direction of the bed. At the trial defendant testified as fol-

---

[1] This statement was taken by a deputy district attorney at the Hayward Police Department on February 19, 1962, from 2:55 a.m. to 3:50 a.m. and read into evidence at the trial.

lows: That he handed her the note in question with the explanation that it showed "how I was thinking one day last week"; that Louella accused him of being crazy and threatened to have him committed to an insane asylum; that she jumped off the bed and "I had the gun out and shaking like that"; that as she jumped off the bed, he whirled around and she grabbed one of his arms with one hand and the gun with the other at which time the gun discharged; that defendant fired a second shot when Louella was in front of him and facing the door; and that at this point they were standing between the beds and "about halfway, a third of the way down from the wall."

The testimony of both parties as to the third shot is substantially in accord: defendant pointed the gun at Louella's face, she pushed it aside with her left hand, and as she did, it went off again, wounding her left hand. As Louella marked it on the diagram, she was still near the foot of the second bed and defendant was a short distance out from the bed and toward the east wall. He then pushed her against the second bed and "put the gun in my face again." In view of the location of the beds and the chest, it is to be noted that all of this activity must have taken place in a very limited space.

At this point the door opened and Louella's father and her brother James came into the bedroom. As they did so, defendant stood up, put the gun to the right side of his head and said "I will shoot myself." The father walked over slowly to defendant, grabbed him, and in a rolling motion both of them fell onto the bed near the north wall where Susan was lying. As defendant hit the bed, "his legs hit it, and kind of sat down" so that he then fell across the bed on his back. Mr. Spence was on top of defendant but "more to his right side." The gun was in defendant's right hand during the foregoing scuffle and as the two men started to fall on the bed, the gun discharged, causing powder burns on Mr. Spence's left ear and the left side of his face. The gun fired from defendant's right to his left and in the direction of the eastern wall. This would be along the length of the bed and towards the head of the bed. Mr. Spence estimated that when it went off as both men were falling, his head was then about three feet above the level of the bed.

James Spence, Louella's brother, then jumped on defendant, pushing his father off as he did so, and grabbed defendant's hand which held the gun. James threw defendant's hand back over the edge of the bed, and as he did so the gun went off again. As a result the gun was firing downward,

away from the bed and into the baseboard of the north wall. James then hit defendant's hand and the gun fell to the floor.

In the course of these events and while Louella's father was advancing on defendant, Mrs. Spence took Louella out of the bedroom. It was later determined that Louella had been wounded in her left hand, her neck, and her right shoulder from which a doctor removed a bullet.

While defendant, thus disarmed, was trying to get up and off the bed, Louella's father observed that the former was lying across Susan's "hips and feet." Susan was lying face down on the bed on the side next to the wall. Mr. Spence grabbed defendant's arm and pulled him up. As he did so, he noticed a spot of blood on Susan's back. He testified: "I said, 'Oh, Eddy, you shot your baby.' ... He kind of turned his head slightly that way and said, 'Shot my baby?' He said, 'Lord, let me get out of here.' He hit the door and run [*sic*]."

Shortly thereafter, defendant entered the Holiday Bowl in Hayward and asked the bar manager to call an ambulance and the police, stating that he had "just shot my wife and kids" but "didn't mean to shoot the kid." Defendant then drove away. Within a short time he was apprehended by the Fremont police.

Susan was dead when the police arrived at the Spence residence. Expert evidence was introduced at the trial that she died of shock and hemorrhage resulting from a gunshot wound in the back. No bullet was found in her body. According to such testimony, the bullet entered approximately 1 inch to the right of the midline of the back and 2½ inches below the seventh cervical vertebra; it then passed forward, slightly upward and slightly to the left and exited at the inner third of the left clavicle. The expert pathologist further testified that from the markings at the point of exit, "I would think that this exit was lying against something . . . whether a floor or a bed or something, . . ."

Defendant contends before us that (1) the record does not contain sufficient evidence to support a second degree murder conviction in that the prosecution failed to offer proof as to the fatal shot; (2) defendant was denied due process of law by the use of an inadmissible confession; and (3) defendant was denied due process of law in that the prosecution used perjured testimony.[2]

---

[2] It is to be noted therefore that defendant does not question the sufficiency of the evidence to support his conviction on the second count.

The gist of defendant's argument in support of his first contention is as follows: Only five shots were fired; only three of the five shots may be said to have been fired with intent to commit murder; the other two shots were fired in the course of a struggle to subdue him and possibly to prevent him from taking his own life; when the last two shots were fired, his previous "state of mind had subsided" so that they were fired without the express or implied malice requisite for second degree murder; the prosecution failed to prove which of the five bullets killed the victim; and, since the fatal bullet could have been one of the last two fired, the prosecution failed to prove beyond a reasonable doubt an essential element of the crime, that is, malice.

The Attorney General makes two arguments in reply: First, the fatal shot must have been one of the first three directed at defendant's wife since the evidence eliminates the possibility that it was either of the last two shots; and secondly, even though the child had been killed by one of the last two shots, since such killing was part of a continuous transaction beginning with defendant's assault on his wife, the offense was still murder under the felony murder rule. As we will explain, we have concluded that the first argument has merit. Since it disposes of the issue of sufficiency of the evidence, we deem it unnecessary to consider the Attorney General's second argument.

We first make some observations on the scope of our review. As pointed out above, defendant claims that the prosecution has failed to prove the element of malice *beyond a reasonable doubt.* Such a contention cannot properly be made before us. ■ It is the trier of fact, not the appellate court, which must be convinced of defendant's guilt beyond a reasonable doubt. "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt." (*People* v. *Daugherty* (1953) 40 Cal.2d 876, 885 [256 P.2d 911], cert. denied, 346 U.S. 827 [74 S.Ct. 47, 98 L.Ed. 352]; *People* v. *Love* (1960) 53 Cal.2d 843, 850 [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], cert. denied, 365 U.S. 886 [81 S.Ct. 1043, 6 L.Ed.2d 199]; *People* v. *Redrick* (1961) 55 Cal.2d 282, 289 [10 Cal. Rptr. 823, 359 P.2d 255]; *People* v. *White* (1963) 218 Cal. App.2d 267, 274 [32 Cal.Rptr. 322].) ■ Our inquiry as to

whether there is substantial evidence to support the conclusion of the trier of fact is governed by the same settled principles applicable to jury cases. (See *People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778]; see our opinion in *People* v. *Atwood* (1963) 223 Cal.App.2d 316, 325 [35 Cal. Rptr. 831].)  ██  As the court stated in *People* v. *Bateman* (1959) 175 Cal.App.2d 69, 76-77 [345 P.2d 334]: ''It was the function of the trial judge in this nonjury case to determine what facts were established by the evidence. Before his conclusion can be set aside on review on the ground of insufficiency of the evidence, it must be made clearly to appear that on no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.  ██  We must assume in favor of the finding of guilt the existence of every fact which the trial judge could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the finding.  ██  If the circumstances reasonably justify the finding of the trial judge, our opinion that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the trial judge. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].)'' (In accord: *People* v. *Maggart* (1961) 194 Cal.App. 2d 84, 99 [14 Cal.Rptr. 745].)

██  With the foregoing rules in mind, we examine the validity of the People's premise that neither the fourth nor fifth shots, which defendant maintains were accidental and without malice, could have killed the child. It is clear from the evidence already summarized by us that the fourth shot was fired as Mr. Spence was struggling with defendant and the latter was falling backward on Susan's bed, the gun grasped in his right hand. The gun was fired toward the east wall and, according to Spence's son, the gun barrel was parallel to the floor. At the time of its discharge close to Mr. Spence's face, the latter's head was still 3 feet above the surface of the bed. Only one bullet was found in the east wall at a point about 4 feet above the floor and about 20 inches above the mattress. According to Officer Moran, the bed on which Susan was sleeping was a metal frame bed and its headboard showed bullet damage. The officer expressed the opinion that the bullet which was lodged in the east wall had first struck the metal headboard. The trial court would have been justified in concluding that this was the fourth shot fired and that in the absence of any evidence that Susan ever

sat up in bed so as to come within the line of fire, the fourth shot could not have killed her.

As we have also set forth earlier, the fifth shot was discharged as James Spence jumped on defendant, throwing the latter's gun hand over the inside edge of the bed in an attempt to disarm him. According to James, the gun was thus fired downward, away from the bed and into the north wall near the baseboard. Subsequent investigation disclosed a bullet imbedded in the wall at this point. However, it also disclosed another bullet lying on the floor in the same general area and near the window which was in the approximate center of the north wall. According to the investigating officers, it was this latter bullet which pierced the mattress in the corner at the foot of the bed, hit the footboard of the bed, and ricocheted off to a point on the right hand side of the window located in the center of the north wall, where it dropped to the floor. Furthermore, it was their testimony that the former bullet found in the north wall near the baseboard had come to rest there after going through the mattress at a point about 2 feet 5 inches from the bottom of the bed. Officer Moran testified that to the best of his recollection there were no marks or bullet holes on the north wall which were consistent with the testimony of James Spence that the gun was fired *over* the inside edge of the bed. The resolution of this conflict in the testimony was for the trier of fact. The trial judge could have very well believed James' testimony that the gun was discharged for the fifth time during his struggle with defendant but that James was mistaken as to the exact point of discharge and that the gun had been fired *through* the mattress, rather than *over* the inner edge of the bed, into the wall.

Nevertheless the pertinent evidence, although subject to the above conflict, can in no way support the conclusion that the fifth shot was the fatal one. The evidence is uncontradicted that the fifth shot was fired after defendant had fallen backward across Susan's hips and feet and defendant's hand holding the gun had been thrown backward near the inside edge of the bed. It is uncontroverted that at the instant of the fifth shot, defendant's right hand holding the gun was the hand farther from Susan's body (defendant being then on his back) and that therefore both defendant and James were between Susan and the gun. Susan was apparently shot while lying face down in bed. From the evidence pertinent to the course of the fatal bullet, already set forth above, and

particularly in view of the fact that such bullet travelled from a point of entry to the *right* of the midline of the back and slightly below the seventh cervical vertebra, upward from right to left, to a point of exit at the *left* clavicle, the trier of fact could well conclude that because of the respective positions of defendant's right hand and the child's back, it would have been physically impossible for the fifth shot to have made such a trajectory. In sum, the trier of fact would be justified in concluding that neither the fourth nor fifth shots killed the child.

The instant record discloses that the investigating officers found a bullet in the mattress in the general area where Susan had been sleeping.[3] As the Attorney General rightfully argues, this position of the bullet would indicate that its velocity had been in some way retarded before it reached the mattress. As already stated, defendant himself admitted that when he fired the first shot at his wife, she was standing between him and the bed and he was firing at her in the direction of the bed. Under all of the circumstances, therefore, the trial court could have reasonably concluded that Susan was not struck by either of the last two shots fired by defendant but was struck by one of the first three shots which defendant had intended for his wife. Contrary to defendant's claim, the court was justified under the evidence in reaching such conclusion, although the prosecution failed to make any chemical analysis or microscopic examination of the bullets so as to identify the fatal bullet. We hold that there is ample evidence to support the conviction.

The fact that through some inadvertence Susan was killed rather than Louella does not prevent the killing from constituting the offense of murder. Where a person with malice aforethought attempts to kill one person but by mistake or inadvertence in the course of such attempt kills another instead, the law transfers the felonious intent from the original object of his attempt to the person killed and the homicide so committed is murder. In effect the crime is the same as it would have been if the victim originally intended had in fact been killed. (*People* v. *Suesser* (1904) 142 Cal. 354, 367 [75 P. 1093] ; *People* v. *Sutic* (1953) 41 Cal.2d 483, 491-492 [261 P.2d 241] ; *People* v. *Buenaflore* (1940) 40 Cal. App.2d 713, 717-718 [105 P.2d 621].)

---

[3] According to the mark made by Officer Moran on the diagram received in evidence and before us, the bullet appears to have been found on Susan's side of the bed and close to the head of the bed.

We take up defendant's second contention on appeal. He claims that he was denied a fair trial and deprived of due process of law guaranteed by the Fourteenth Amendment to the United States Constitution by the introduction into evidence of certain statements given by him to the police and representatives of the district attorney. The essence of his claim is that prior to being interrogated, he was not "advised as to his constitutional rights, to wit: the right to seek counsel, and the right to remain silent, nor was he told that anything said might later be used against him." At the same time, defendant concedes "that a confession is not rendered inadmissible by the mere failure to advise a suspect of these rights." He also makes clear to us that he is *not* contending "that he was threatened in any overt manner or illegally detained, nor did he object to answering questions."

We find no merit in defendant's contention. The record discloses that before the prosecution offered the statement in question, it showed that the statement was not obtained by coercion or inducement. Defendant raised no issue as to the voluntariness of the statement. Counsel for defendant, who is not his counsel on appeal, did not object to the introduction of the statement.[4]      The law is clear that a confession or admission is not rendered inadmissible by the fact that a defendant was under arrest when he made it or by the fact that he was not apprised by the police of his right to counsel, of his right to remain silent if he desired, and that his statements could be used against him. (*People* v. *Hoyt* (1942) 20 Cal.2d 306, 314 [125 P.2d 29]; *People* v. *Tipton* (1957) 48 Cal.2d 389, 393-394 [309 P.2d 813]; *People* v. *Garner* (1961) 57 Cal.2d 135, 148-149 [18 Cal.Rptr. 40, 367 P.2d 680], cert. denied 370 U.S. 929 [82 S.Ct. 1571, 8 L.Ed.2d 508]; *People* v. *Magee* (1963) 217 Cal.App.2d 443, 455 [31 Cal.Rptr. 658].) The instant record fails to disclose that defendant's constitutional rights have been violated.

Finally, we consider defendant's claim that he was denied due process of law in that the prosecution used perjured testimony. The claim arises from the following developments at the trial: Defendant's wife Louella (now Louella Ligon) and her present husband Warren Ligon, called as witnesses for the prosecution during its case in chief, testified

---

[4]The record indicates that defense counsel had previously objected to certain errors in transcription which were apparently corrected to his satisfaction and certain irrelevant material which the prosecutor agreed to delete.

*inter alia* that they first met in August 1961. Louella stated that this occurred *after* defendant obtained an interlocutory decree from her. Defendant had planned to call two witnesses for purposes of impeachment. Counsel for defendant thereafter learned that on the evening of the second day of the trial, both Louella and Ligon had communicated with both prospective defense witnesses for the alleged purpose of influencing their testimony.[5] On the third day of the trial defense counsel informed the prosecutor of these occurrences and both counsel thereupon called them to the attention of the judge in chambers. The record discloses that during these proceedings the matter was discussed among court and counsel in considerable detail. Such proceedings were had at the beginning of the afternoon session and just before the prosecution rested its case in chief.

The court then permitted defense counsel to recall for cross-examination both Louella and Ligon. Both admitted communicating with the witnesses Haas and Hall but denied any intent to bring about a change in any testimony. They also denied making the statements attributed to them by the two witnesses. (See footnote 5, *ante.*) The two witnesses Haas and Hall thereafter testified during the case for the defense.

Defendant argues that in view of the accusations made by witnesses Haas and Hall, Louella's testimony on the issue of defendant's state of mind "must be viewed skeptically" and her testimony in general "should be discredited."

From our examination of the record we are satisfied that no error resulted and that the constitutional rights of defendant were not infringed. It is beyond argument that before he was informed of the above events by defense counsel, the prosecutor had no knowledge whatsoever that the testimony of Louella or Ligon might be false. When the charges were brought to light both witnesses had concluded their testimony. They were then recalled and subjected to further cross-examination for the apparent purpose of determining the veracity of the charges made against them.

The principal question which now seems to be raised is whether the trial judge was entitled to give any credit to Louella's testimony. After submission of the case and argu-

---

[5]Both witnesses later testified for the defense. Earl Haas testified that Louella and Ligon told him not to remember dates prior to September 1961. The second witness Diane Hall testified that in a telephone conversation on November 19, 1962, Louella told her "If you go to court, you don't know anything. ... You remember I met Warren after I got my interlocutory decree. ..."

ments of counsel, the trial judge expressed some doubt concerning part of the testimony of Louella and Ligon.[6] The court's remarks can be construed as referring to that portion dealing with the first meeting of these two parties. If the court felt that both witnesses had testified falsely on this point, obviously the testimony was on a collateral matter. Clearly the trial judge could reject the testimony of Louella and Ligon as to the date they first met, and still accept the testimony of Louella as to the crucial circumstances surrounding the commission of the crime. Even if he believed that Louella had wilfully sworn falsely as to a material point, it was within his discretion to accept that portion of her testimony which he believed to be true and reject the rest. (*People* v. *Rodriguez* (1959) 169 Cal.App.2d 771, 777 [338 P.2d 41]; *People* v. *Robles* (1960) 183 Cal.App.2d 212, 214 [6 Cal.Rptr. 748]; *People* v. *Salazar* (1962) 201 Cal.App. 2d 284, 288 [20 Cal.Rptr. 25].) ▆▆ ''Section 2061, subdivision 3, Code of Civil Procedure—'[t]hat a witness false in one part of his testimony is to be distrusted in others'— does not command the rejection of the entire testimony of one who has testified falsely in part.'' (*People* v. *Bodkin* (1961) 196 Cal.App.2d 412, 415 [16 Cal.Rptr. 506].) It is obvious from the court's remarks (see footnote 6, *ante*) that it was most careful in appraising the testimony here under attack, particularly that of Louella. We find nothing in the record supportive of the claim that the court relied upon perjured testimony in reaching its decision.

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

---

[6] ''Preliminarily, the Court notes for the record that in this case, as in all cases, the Court is deeply concerned with the credibility of each and every witness who has testified upon the trial. Here, for reasons which are quite apparent in the record, the Court has scrutinized, particularly scrutinized the testimony of the witness Louella Ligon, and has determined that the *integrity of certain portions of her testimony* might at least be subject to question.

''This matter of credibility, while obviously affecting the weight of her testimony, does not necessarily meet the test required by law in relation to the offense of perjury. Accordingly, the Court reserves any further actions relative to possible criminal charges against either Louella Ligon or Warren Ligon to the proper departments of government.'' (Italics added.)