[Crim. No. 4124. Third Dist. Feb. 3, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND HEAD CLAYTON, Defendant and Appellant.

Neil McAllister, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris Maier, Assistant Attorney General, Edward A. Hinz, Jr. and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendant was convicted of second degree murder.

The questions on appeal are: (1) Did the court, in instructing on second degree felony murder improperly advise the jury that provocation by words alone was no defense to the felony charged (assault with a deadly weapon)? (2) Did the court admit into evidence testimony of a missing witness given at the preliminary hearing on an insufficient showing of due diligence in the efforts to locate said witness?

We answer both questions in the negative and also find no miscarriage of justice. (Cal. Const., art. VI, § 13.)█

On the night of October 27, 1965, at approximately 11 p.m., defendant, intoxicated, walking on 2d Street, between I and J Streets, in Sacramento, passed another pedestrian, Davis, a colored man, with whom he was unacquainted. Defendant then walked to his Ford pickup parked a short distance away, procured a .22 rifle therefrom, returned to 2d Street and fired two shots in the direction of Davis. Both shots missed Davis but one hit and killed Jose Martinez, a passerby. Martinez was also unknown to defendant. Defendant then got into his pickup and just sat there until the police arrived and arrested him. One of several persons who had reached the scene of the killing heard defendant say (to himself), while sitting in his pickup, "I guess I'm in trouble now"; also, "I ought to shoot" or "kill all them black son of a bitches." As to that much of the events of the shooting there is no substantial conflict.

Defendant testified in his own behalf. We outline essential portions of his evidence. He was a 58-year-old rancher who was in charge of a 4,000-acre sheep ranch at Dunnigan, Yolo County. He had been in the armed forces for three and one-half years during World War II and was familiar with the use of firearms. The homicide weapon was a .22 rifle which he kept loaded in his pickup, using it to "run the dogs away" when they tried to kill the lambs.

On October 27 he had gone to Sacramento before dark and had parked his car on the north side of J Street a short distance west of the northwest corner of the 2d and J Street intersection. (The car remained there at all times until after the shooting.) He joined an acquaintance, the two procured bottles of wine at a liquor store and drank steadily for a 5-hour period (about 6 to 11 p.m.).

Defendant remembered that he was standing on the sidewalk (apparently at or near said northwest intersection corner) when Davis crossed the street and passed him. Davis, walking pretty fast, was swinging something. (On cross-examination defendant could not describe what this something was.) He said, "I thought he was going to hit me with it. And he called me a white son of a bitch, told me to get out of his road." Davis, however, in fact, walked on past without either molesting defendant or saying anything more. In fact, defendant admitted Davis at no time attempted to hit or push him, and the words just quoted constituted the only words or acts of a provocative nature claimed by defendant. After Davis had passed, defendant said he looked and saw that Davis had stopped some distance away from him. Defendant walked around the corner of his pickup and got his rifle. His stated reason: he had once been "strong-armed" and robbed and thought Davis might have similar designs. He did not wait to find out. He walked back around the corner to 2d Street, then north until he was within 15 feet of Davis who was still standing on the sidewalk. Defendant said he fired in Davis' direction "right quick." He fired from the hip, aiming to miss Davis by a foot. He said he fired (northerly) straight down the middle of the sidewalk. Davis then went over against the building along the sidewalk and defendant fired again into the building. Defendant insisted that on both occasions he was not trying to hit Davis; he said, "I really was trying to scare the man off the street."

Having fired the two shots, defendant returned to his pickup and sat there until the officers arrived and arrested him. He did not see the victim at any time. In fact, it was his impression no one else was in the vicinity except his companion, a man named Babbit, and, of course, Davis. (There actually were eyewitnesses who testified for the prosecution and who described others as being at or near the scene.)

Defendant's last statement on direct examination was that he was drunk at the time these events took place.

Cross-examination brought out defendant's statement, "I have nothing against colored people." Defendant also said: "I didn't have any bad feelings against him." When asked, "He hadn't done anything to you, had he?" he answered, "No, he hadn't."

Davis was the missing witness whose testimony at the preliminary hearing was admitted into evidence at the trial. His version of the encounter sharply conflicts with defendant's.

According to Davis he had just bought some salami and had crossed the street from the southwest to the northwest corner of the intersection on his way to his hotel room on I Street. He talked with friends of his, also Negroes, and there were jocular comments from the latter about the salami. Walking north along the sidewalk he passed defendant who was with two companions. When Davis was 3 or 4 feet from defendant, the latter said that he was going to kill ''all the black son of a bitches.'' Davis had said nothing to provoke this remark. When defendant spoke Davis stopped but when defendant's friends told him to walk on because defendant would not do anything, ''he's just drinking,'' Davis did so. Just a short time had elapsed, however, when defendant came back around the corner carrying a rifle and yelling, ''Where's the black son of a bitch. I'm going to kill him.'' Defendant then leveled his rifle at Davis. At that point, says Davis, ''I took off.'' He ran between cars parked along the west side of 2d Street, then on towards I Street, heard one shot and then a few seconds later another. By the time of the second shot he had reached I Street.

Other prosecution eyewitnesses corroborated the essential portions of Davis' testimony except that no witness was in a position to hear words spoken by either Davis or defendant. A witness, who saw the shots fired, placed defendant as being close to the corner and stated defendant aimed the gun at Davis, sighting along the barrel with the butt of the gun raised in the normal position along his shoulder, and Davis broke and ran from a point on the sidewalk adjacent to an employment office. The employment office is 48 feet north of the point near the corner from which defendant fired the shots. Another witness saw Martinez fall. Martinez' body was found by the police officers lying in the gutter at a point also adjacent to the employment office. Defendant had turned after firing the first shot, then swung around and fired the second shot without appearing to take aim.

Defendant was the only witness called for the defense.

RE THE PROPRIETY OF THE COURT'S INSTRUCTION.

■ The prosecution's case came within the doctrine of ''transferred intent.'' Under that doctrine when a person purposefully attempts to kill one person but by mistake kills another instead, the law transfers the felonious intent from the object of the assault to the actual victim. (*People* v. *Sutic*, 41 Cal.2d 483, 492 [261 P.2d 241] ; *People* v. *Suesser*, 142 Cal.

354, 367 [75 P. 1093]; *People* v. *Leslie*, 224 Cal.App.2d 694, 704 [36 Cal.Rptr. 915].) As stated in *People* v. *Buenaflore*, 40 Cal.App.2d 713, at page 717 [105 P.2d 621] : "In other words, the crime is exactly what it would have been if the person against whom the intent to kill was directed had been in fact killed."

Under the evidence there were several possible guilty verdicts. First, assuming defendant in view of his condition had the ability to premeditate, and the testimony of Davis would minimize any condition of drunkenness, a conviction for first degree murder was a possibility. Since the jury did not find the defendant guilty of murder in the first degree, that offense need not be discussed here. The jury did find him guilty of second degree murder. ■ By statute second degree murder is the unpremeditated killing of a human being, with express or implied malice, which does not fall within homicide committed in the perpetration of one of the offenses enumerated in Penal Code section 189. (See Pen. Code, §§ 187, 188 and 189.) ■ As the court correctly instructed the jury, it may occur (1) when the killing results from an unlawful act the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another, or (2) when the circumstances attending the killing show an abandoned or malignant heart, or (3) when the killing is done in the perpetration or attempt to perpetrate a felony such as assault with a deadly weapon. (See *People* v. *Finley*, 219 Cal.App.2d 330 [33 Cal.Rptr. 31], and other cases cited in 1 Witkin, Cal. Crimes (1963) § 325.)

The evidence above related would have abundantly supported a conviction under any of the three classifications stated. Defendant does not contend to the contrary. The court gave further instructions elaborating on the third category. ■ The felony-second-degree-murder rule is court-made law in California. " 'A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder. . . .' " (*People* v. *Williams*, 63 Cal.2d 452, 457 [47 Cal.Rptr. 7, 406 P.2d 647], quoting from *People* v. *Ford*, 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) In the case before us the trial court properly defined assault with a deadly weapon for the jury. That instruction is not objected to. The challenged instruction was then given:

■ "No words of abuse, insult or reproach addressed to a person or uttered concerning him, howsoever insulting or objectionable the words may be, *if unaccompanied by any threat or apparent threat of great bodily injury* or any assault upon the person, will justify him in an assault with a deadly weapon, and the provocation only of such words will not constitute a defense to a charge of having committed such an assault." (Italics supplied.)

This instruction, in the exact language used, was approved in *People* v. *Mueller* (1956) 147 Cal.App.2d 233 [305 P.2d 178] (hearing by Supreme Court denied). Defendant does not argue the giving of it as error generally. The theory of defendant's objection to its use in this case is that although provocation by words alone is ordinarily not a defense, it may sometimes be a defense to a charge of voluntary manslaughter. Defendant cites *People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1]. The court in the *Valentine* case (see pp. 138-144), following an earlier case *(People* v. *Logan,* 175 Cal. 45 [164 P. 1121]), and after noting a split of earlier authority in both our Supreme Court and in the California Courts of Appeal, stated it was a matter for jury determination whether provocation-by-words could so stir the passions of "the ordinarily reasonable man" to the point of bringing his act within the definition of voluntary manslaughter, to wit: the unlawful killing of a human being without malice upon a sudden quarrel or heat of passion. (Pen. Code, § 192, subd. 1.)

The *Valentine* case is inapplicable here. In the first place, the instruction given by the court there was not the same: There the court had instructed the jury categorically (see 28 Cal.2d at p. 137) that provocation by words only was *never* sufficient to reduce the offense of intentional homicide with a deadly weapon from murder to manslaughter. More temperate words were used here: The instruction given limited the exclusion of provocation-by-words to cases where such words were "unaccompanied by any threat or apparent threat of great bodily injury." Secondly, the trial court *gave* a lucid and detailed instruction on voluntary manslaughter in which it spelled out when provocation would, and when it would not, be such that a jury might find that it would arouse "heat of passion" in an ordinarily reasonable person.

As we read the transcript of this case, the trial court leaned over backwards in favor of defendant in giving any instruction on voluntary manslaughter. In defendant's testimony there are alleged words which may possibly be construed to be

words of provocation but there is a complete denegation by defendant's own testimony of any act done in heat of passion[1] and a total absence of any quarrel of a magnitude which would permit any reasonable jury to find that defendant in shooting at Davis was acting like an ordinarily reasonable man. Defendant's whole defense was built on the proposition that in his drunken, befuddled condition he had mistakenly thought that Davis was going to rob him, and he therefore obtained and fired his rifle, intending not to hit, but to frighten, Davis and cause him to run away. Even if one accepted defendant's testimony at face value, no jury could reasonably find a killing upon a sudden quarrel or heat of passion such as would *"naturally be aroused* in the mind of an *ordinary, reasonable person . . .* or in the mind of a person of *ordinary self-control."* (*People* v. *Carter* (1961) 56 Cal.2d 549, 564 [15 Cal.Rptr. 645, 364 P.2d 477], quoting from *People* v. *Brubaker* (1959) 53 Cal.2d 37, 44 [346 P.2d 8].)

 Finally, even should we assume that which we do not find—that there was error in giving the instruction challenged, it was harmless error. There was no possibility that the jury, absent this instruction, would have reached a verdict more favorable to the defendant. It is obvious the jury did not "buy" defendant's shoot-to-miss account of the killing. Had it done so it would have brought in a verdict of *in*voluntary manslaughter. The complained-of instruction had no possible relation to a jury finding of the commission of that crime. As we have shown, defendant, himself, had denied the existence of the essential elements of voluntary manslaughter. It is impossible for us to believe that a reasonable jury might have acquitted defendant, but, even assuming that possibility, nothing said in the instruction under attack was relevant to the jury's determination in that regard. There was no miscarriage of justice.

RE THE EXERCISE OF DUE DILIGENCE IN THE ATTEMPT
TO PRODUCE THE WITNESS, DAVIS, AT THE TRIAL

 At the time of the trial[2] Penal Code section 686, subdivision 3, provided in substantial part that a defendant is entitled to be confronted with the witnesses against him, ex-

---

[1] We requote defendant's denial: "I didn't have any bad feelings against him. . . . Q. He hadn't done anything to you, had he?" A. No, he hadn't."

[2] Said Penal Code section has been abbreviated (Stats. 1965, ch. 299, operative Jan. 1, 1967, and supplemented by Evidence Code, §§ 240, subd. (a) (5) and subd. (b), 1290, subd. (a), and 1291.)

cept that testimony given and transcribed in a preliminary hearing at which defendant or his attorney has cross-examined, or has had the opportunity so to do, may be used "upon its being satisfactorily shown to the court that he . . . can not with due diligence be found within the state. . . ."

Defendant was represented at the preliminary hearing by a public defender who cross-examined Davis quite thoroughly.

It has been held that " 'due diligence' . . . is a relative term," depending largely upon "the discretion of the trial court" which will not be disturbed on appeal in the absence of a showing of abuse of discretion. (*People* v. *Volk*, 221 Cal.App.2d 291, 294 [34 Cal.Rptr. 351].) Here the trial court heard and was satisfied with the following evidence: Davis whose Sacramento hotel address at the time of the proceedings before the magistrate was known was asked to notify the district attorney's office of any change of address. He appeared at the preliminary hearing. There he was again told to notify the district attorney of any address change. He told that officer if he was not at his Sacramento hotel address he could be reached in Los Angeles at St. Vincent de Paul Society, the address of which was given. Eighteen days before the trial date a process server tried to serve Davis with a subpoena and found he had checked out of the hotel and stated he was leaving town. A former employer was seen to no avail. Inquiries from the police, Department of Motor Vehicles, the county hospital, Sacramento Municipal Utility District, a visit to 10 hotels (at three of which Davis was known but his whereabouts unknown) were tried. Bars were visited; also employment agencies, the telephone company, and the California Bureau of Criminal Identification and Investigation. Directories were consulted, and he was sought at the Sacramento and Yolo County jails. Inquiries made at the places mentioned above, not once but twice, all brought no information. A subpoena directed to Davis at the Los Angeles address given was sought to be served. He was not there and not known there. (It was stated that as many as 4,000 men a day went through the facility maintained by the society.)

We hold the trial court did not abuse its discretion in admitting the transcript of the preliminary hearing on the basis that "due diligence" had been exercised.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.